PinilisHalpern, LLP
William J. Pinilis (024721992)
160 Morris Street
Morristown, NJ 07960
Tel: (973) 401-1111/Fax: (973) 401-1114
Attorney for Plaintiff
File No.: 12204

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

ROSA ACOSTA,

                Plaintiff,    Civil Action No.: 2:18-cv-17710-MCA-MAH

     v.

RESTAURANT, BAR AND
NIGHTCLUB OWNERS DOING        DECLARATION OF STEVEN
BUSINESS AT FARAONES             CHAMBERLIN
NIGHTCLUB and INFINITY
LOUNGE,
               Defendants.

     I, STEPHEN CHAMBERLIN, hereby declares, pursuant to 28 U.S.C. § 1746, the following under the penalties of perjury:

     1.     I have been a model and talent agent since 1989. I have served as agency director at LA Models Management, which is one of the world's largest and most respected talent agencies. I also founded a talent agency known as Warning Management, Inc., and subsequently took this company public. I have extensive background, knowledge and experience in the modeling and talent industry, as well as with the economics of image use, the valuation of image uses, model and public personality career valuation and the effective rates of work and valuation.

     2.     Over the past thirty (3) years I have represented hundreds of the world's top models. In that capacity, it has been my job to be intimately familiar with the modeling market, to quote work, negotiate deals and understand the particular factors driving the pricing for the

1

particular work and the Models. I have quoted rates for my clients thousands of times. I am very familiar with market rates for high-end models today, because I continue to quote, negotiate and oversee rates, work and career development for my clients on a regular basis. My Curriculum Vitae is enclosed herewith as Exhibit A to this Declaration.

3.      The statements and opinions provided herein are based on information provided to me by counsel for the Plaintiffs in this case but are the result of my own personal experience, education, and expertise in the modelling industry.

4.      I have been advised, and do believe, that Faraones Nightclub ("Defendant"), the have taken and used, without authority, certain photographic images belonging to certain highly successful and sought-after models, specifically here, Plaintiff, Rosa Acosta ("Plaintiff").

5.      I have also been advised, and do believe, that Defendant is presently in default.

6.      In connection with and in support of Plaintiff's Motion for Default Judgment, I have been asked by Plaintiff's counsel to evaluate and value the compensation the Plaintiff would have and should have received for the use of the Images by Defendant. Having done so, I provide my expert opinion in this Declaration as to the fair market value of Defendants' use of each Plaintiff's image in promotional, marketing and advertising media, on websites, social media and other forum. My expert opinion as expressed in this Declaration does not include any estimation or regarding the calculations of other damages, such as special, consequential, exemplary, or punitive damages.

**A. Information/Materials Reviewed and Methodology Employed in Formulating Expert Valuation Opinion.**

7.      In conjunction with the preparation of this Declaration, I have reviewed and examined, among other things: (a) the Complaint filed in this action along with all exhibits, including the photographic images of the Plaintiff used by Defendants, the product advertised,

2

the usages, any alterations to the images, the media used, and the mode and scope of distribution in various markets; (b) the Plaintiff's earning history, development, growth, positioning, experience, current exposure, name recognition, personal publicity, social media profile, market demand, complimentary employment, and other factors determining and effecting earning capacity; and (c) the type and the caliber of clients that have traditionally employed Plaintiff.

8.      Plaintiff seeks modeling jobs that will enhance her stature, protect her reputation and image and not serve as a potential deterrent for commercial brands to affiliate with Plaintiff. In my experience and expertise, having one's image used in a way that would appear to sponsor, sanction, endorse, support or denote participation in the events at the adult nightclub would damage, harm and devalue the Plaintiff's career due to the nature of the industry and product advertised by Defendant. Accordingly, Plaintiff would not consider or agree to the use of her images by Defendant. My interview with Plaintiff in this case confirmed this assumption as Plaintiff told me that she would not have agreed to appear in the Club ads made the basis of this lawsuit.

9.      Based on my research via the internet and a review of the images referenced in the Complaint, I understand that the Defendant engages in the business of marketing and advertising for specific events and venues. Defendant promoted club events and business for various entities on websites and in social media. The use of Plaintiff's image, likeness and identity in connection with promotional, marketing and advertisements for the Defendant and ultimately the paying club was intended to and does necessarily imply that the Plaintiff either worked at the Club, would be in attendance at the advertised event, and/or endorsed the Club or events depicted. In the unlikely event a Model of the Plaintiff's caliber here would agree to such

3

a job and usage, there would be negotiated a substantial premium for the work to offset anticipated and expected losses of marketability.

10.     It is also my understanding via interview with the Plaintiff that she was never approached by the Club, or the Promoter, or any agent, was ever asked to authorize or approve any use whatsoever by the Promoter of her image, and never consented to the Promoters use of her image, likeness or identity for any purpose whatsoever.

11.     The rate I have established below are based on the fair market value of Plaintiff's image for the specific appropriated use by the Defendant but does not calculate the damage or possible end of their career, damage to reputation, or loss of other clients and advertisers by the Plaintiff being associated with this type of business.

12.     My opinions are based in part upon the way in which work in the modeling talent industry is priced. The rates that models are paid are based upon numerous factors, including (a) a model's desirability, based on numerous factors, including the demand for her services; (b) a model's work history, such as prior associations, appearances, endorsements, or advertisements; (c) the nature of the business seeking a model's service, the type of product, whether exclusivity is sought, the embarrassment factor from being associated with the advertisement or marketing of certain products, or similar considerations; (d) the history of the business seeking a model's services, the style, quality and production of previous advertising and promotions, and its hiring of other models and celebrities; (e) exposure, namely how broadly the Model's likeness will be circulated; (f) the type of exposure, or the "usage" of the image, such as advertising, social media, third party promotion, branding, coupon, extra usage, or corporate identity; (g) the length of exposure of usage, the period of use, and any renewals or rollovers; and (h) the nature, duration and location of the actual shoot and production.

**B. Determination of Fair Market Value of Defendant's Unauthorized Use of Plaintiff's Images**

13.     In estimating the actual damages for each individual Plaintiff, I employed the same approach, methodology, and process that I would typically employ when determining what to charge a company or other entity that is interested in hiring models I represent.

14.     There are two primary factors a model and/or her agent will consider before consenting to a job and authorizing the use of her image: 1) the job/exposure/ association with product and/or resulting images or tear sheets helps their career; and 2) compensation / payment.

15.     In this case, Plaintiff's career would not have been positively impacted by appearance in the Defendant's advertisements; indeed, her association with Defendant could be detrimental to their commercial prospects.

16.     As such, the only reason Plaintiff would have agreed to appear in the Defendant's advertisements is because she was paid enough money to do so.

17.     The predominant way an authorized user could obtain images for advertising is to negotiate a contract first and arrange a photo shoot. All Usages should be negotiated prior to the actual use taking place. It is critical to note that Models do not sell pre-shot images for Advertising.

18.     All advertising for specific products involves a photo shoot.

*Day Rate*

19.     The basis of all negotiations in the industry is establishment of a "day rate" for work by the model. This is the base rate of compensation (determined by factors listed below) for the Model's time on the day of shoot.

20.     Models do not sell images previously shot to clients to be used in their Advertising. The only legal way Defendants could obtain the images they require is to 'book' the

5

model for a photo shoot after negotiations of rates and usages either directly with the Model or through an Agent representing the Model. A Day Rate is also the basis of compensation for a model. Time spent on set is calculated as the Day Rate. In this case the Defendant did not engage the models in a photo shoot but misappropriated the images. The Day Rate is calculated into Fair Market Value.

21.     Chief among the factors a Model or her agent will consider in arriving at a day rate is the Model's desirability, based on numerous factors, including the demand for his or her services and relevance to product. Models and Talent spend considerable years to develop their brand (brand or image) which is often based on fitness, beauty and sexuality. Social Media followers, star rating, current press coverage, Marriage and personal relationships, current published work, TV appearances, Movie appearances and Social Media attention must be considered. The number of Social Media followers has become extremely important in consideration of a Model's bookings. Endorsements for posts on their social media platforms is directly dependent upon the number of followers and audience engagement. A client's audience and customers recognition grows with the Model's growth in Social Media numbers as does the income for the commercialization of their image. For many other factors listed there is no quantitative measure available to add or detract value to a Model's day rate but should be considered in any negotiation. Much the same as a sportsman negotiating a new contract would consider the past seasons factors such as home runs hit, touchdowns scored, sacks achieved, etc.

22.     Another factor considered is the Model's work history, such as prior associations, appearances, endorsements, and advertisements including rates established for the commercialization of their image. The Model's work history for an agent is the basis to help establish a "day rate" to quote in negotiations for future assignments. It is important to note that

6

past 'day rates' help establish a basis for future assignments but Models are constantly trying to raise their rates. Past rates will apply to similar product but each new assignment's rates will depend upon the Product to be advertised and factors as listed below.

23. A final consideration is the nature of the business seeking a Model's service, including but not limited to the type of product, service or customer experience.

***Usages***

24.     Once the Day Rate for each model has been established, the further costs to the Advertiser depends upon the "Usages".

25.     A Day Rate for each of the Usages is the basis of most negotiations in the Model Industry. It must be noted that Usages as described here are categories of use not the number of times an image is posted. In fact, once a negotiation has taken place and a contract agreed to, images produced from the photo shoot can be used in the particular Usage Categories an unlimited time in the agreed time period.

26.     I do not charge a rate for the number of times an image is posted. I quote one day rate for the method of distribution. In this case Social Media is the method of distribution of the Model's images.

27.     Advertising usage is included as the use when attaching the Advertiser's name to the Model's Image and is included in the Day Rate as paid for the model's time on set. This also allows the Advertiser to use the images produced on their business website. In other words, an Advertiser can engage the model, produce images, attach their name and use on their website for One day rate total. All other Usages will be negotiated additionally.

28.     "Branding" is a category of use that is included in my Fair Market Valuation and would be negotiated before a model was photographed. Models advertise product. The majority

of work performed by the Models in this case have Advertised products such as Clothes, Swimwear, Lingerie, Beverages and beauty products. When the Client mentions 'product' in their descriptions or tagged language or labels or banners it is referring to the product.

29.     Defendant is advertising the Plaintiff as the product and any reference to the product in these advertisements becomes a personal reference to the Model and is termed Branding. Branding ties the Model to the establishment, makes the advertisement a personal endorsement, implies that the Model will be in attendance at the club or event, works at the club, is available for patrons of the club or describes services that the Model would be performing at the club. Branding use is quoted at a rate equal to the Model's Day Rate and is charged once, no matter how many times "Branding" language is used.

30.     Coupon/ Third Party use is when a Model's mage is used to promote special deals over and beyond the original Product agreement. In the case of Alcohol Advertisement by Name Brand Alcohol these advertisements are closely monitored by the Advertising Counsel. Minimum age of 25 and other factors that can affect a Model's ability to work must be considered. Alcohol Advertising for a model is always a lucrative option for work but a certain degree of exclusivity must be adhered to. Clients do not want to see the same Model endorsing many different brands and it is an agents duty to disclose conflicts to potential Advertisers. Coupon/Third Party Usage is quoted at a rate equal to the Model's Day Rate and is charged once, no matter how many times Coupon/ Third Party is used.

*Fair Market Value*

31.     Once a job has been negotiated (day rate plus usages) and the images are used on a website on the world wide web, the number of images from the shoot, the number of times used, the size of the images, the number of times the image was viewed or "liked" and the

duration that the images remain available on a site are all factors that are outside the influence of the agent or model.

32.     Once a Model's job has been negotiated and shot the success of a campaign, the number of views, likes and distribution are the responsibility of the client. Once an image is on the web and associated with an Advertiser the number of views, the number of 'shares', the number of downloads and copies made is generally unknowable.

33.     In addition to employing the factors identified above, I reviewed the Defendant's use of the images of the Models, the product advertised, the usages and the distribution of the images to various markets, the number of images used and the type of each usage, all of which are set forth in detail in the Complaint, which I reviewed. I established a fair market fee for the use of Plaintiff's image taking account the Plaintiff's payment history, work quality, experience, exposure and duration of career, and then multiplied each image used by the number of separate types of usage.

34.     Finally, in my 30 + years of negotiating contracts I have never written or encouraged a Model to sign a contract without a definition of a time usage period. A one-year contract from the date of first usage (Giving the advertiser time from the shoot to produce the advertisement until first use) for a year is the most common time period. I have seen and utilized must shorter contracts for a week, or a month or say Spring of a particular year. The one-year contract will often have terms for a rollover or extended period. Pre-negotiated rates and terms may be included but additional usages on time use are always negotiated prior to the original contract expiration.

35.     What this means is that the time use by Defendant would be considered and an end period would be included for Image to be removed. In assessing damages I would include a

fee or rollover based on time that the images are used. Rarely, if ever, is there a contract with Unlimited Time for use allowed. Many of the images used by Defendant may have remained on Social Media for significant periods of time, with no indication that the Defendants would have intended to remove the imagery before being contacted in this litigation. Thus, Defendants had effectively used the Models' images for an "unlimited" duration. In my experience there would be a renegotiation or rollover (repayment of original fee) at minimum every year of use.

36.     Determining the fair market value of the Defendant's use of the Plaintiff's image necessarily requires me to attempt to recreate a negotiation process that did not occur. As such, my opinion as to the fair market value takes into consideration the factors normally considered by talent, clients and their respective agents and representatives when negotiating the value of the use of the models' images to promote the clients' goods or services. I must additionally account for the value inherent in the ability of Plaintiff to control the course and selection of business opportunities and, thus, the direction of their career which, in this case, was taken away by Defendant. These considerations are always a component of the process by which the parties to a negotiation would determine the value of the use of the Plaintiff's image, and so must be considered when establishing fair market value.

37.     In this case, the Defendant circumvented the negotiation process altogether.

38.     As a consequence of the Defendant bypassing all levels of negotiation with the Plaintiff, we must retroactively assess the factors that would be accounted for in the proper contractual negotiation process. This includes the status of the Plaintiff, the nature of the use and true harm to the Plaintiff in not being able to control the way in which her image was used.

39.     The aggregate total in actual damages across Plaintiff as a result of Defendant's actions is at a minimum of $20,000.00. The range provided in my report presumes a mutual

negotiation between the parties; however, in the absence of that negotiation, the actual damages collectively suffered by the Plaintiffs in this case amount to $20,000.00. (See, my expert report attached hereto as Exhibit "B").

40.    I have arrived at this number by using the methodology set forth above and adding together the individual rates for the Plaintiff.

41.    This figure does not include any potential disgorgement of profits, punitive or exemplary damages, attorneys' fees and/or interest.

42.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

By: _____
      Steven Chamberlin

Dated: February __, 2023

# EXHIBIT A

Professional Experience

Stephen Chamberlin
TERRAZOS SUITES
1871 NW SOUTH RIVER DRIVE
#608
MIAMI, FL. 33125

**Rumblestorm Management January 2009 to present**
**Owner - Director**

Rumblestorm Management is a worldwide sourcing and management company that operates as a paid scout and development platform for Models' working all over the world. Currently managing Models' both male and female in the US, France, Great Britain, Spain, Germany, Japan, Singapore, Italy, Australia and New Zealand.

Agencies that I am actively engaged and working for and with include but not limited to, IMG Models' Worldwide, DNA Management NY, Major Models' Worldwide, NY Models' NY, Elite NY, Ford Models' NY, Society Management NY, Women NY, LA Models' LA, M Management LA, Next Models' Worldwide, Silent Models' Paris, Premier Management London, Select Models' London and Storm Management London.

I place Models' with these and other agencies in multiple countries, book, negotiate, invoice, collect commissions, source tear sheets and monitor usage of jobs.

**Michele Pommier Models**

**February 2016 to March 2019 Agent / Scout**

Michele Pommier Models' is one of the oldest, most established and respected agencies in the United States. My involvement as an agent is to add my international experience and negotiating skills to expand bookings, secure representation of established Models' and to scout and develop new talent.

**Warning Management Inc. November 1998 to August 2008** Founder - Partner - Director

A full service management company representing fashion Models', actors, commercial talent, musicians, bands, photographers, directors, brands and companies. Revenues are primarily derived from commissions paid by clients, from engagements including but not limited to, bookings, endorsements, sponsorships, commissions, residuals, exclusivities and royalties. The mediums worked in include but not limited to, Print, Television, Videos, Packaging, Billboards, Point of Sale, Corporate Videos, Appearances, Speaking Engagements, Film, Events, Event Management, Organization, Consultancies and Negotiations.

My responsibilities were total management and hands on involvement in every facet of the company. As director and signatory for the company, I had a complete working knowledge of every negotiation, deal and client that we represented. I was responsible for not only branding and development of the major clients but also for branding and development of the company. I built the company from one employee and zero revenue into a publicly traded company with revenues of over $30 million per annum.

**LA Model Management (Los Angeles, CA)**

**NY Model Management (New York, NY) December 1991 to May 1998**
**Agency Director**

LA model Management is one of the world's oldest largest and most respected agencies. I represented Models', commercial talent, actors, production services, runway, hair and make-up artists and casting services. My responsibility was the development of talent and the International marketing of the company to clients worldwide. I established the first corporate client endorsements by actors and opened a whole new industry within an industry. I developed Model Searches and TV shows that were fully sponsored and are still in production now.

**Spott Model Management (Sydney Australia) January 1989 to August 1991**
**Agency Director**

Spott Models' was a boutique agency in Sydney specializing in the development of Models' for the world market. In the two years working I sent over a hundred Models' out to various agencies worldwide and represented more than two hundred international Models' on their visits to Australia.

**Association of Surfing Professionals. (ASP) December 1989 to March 1990**
**Tour Representative / Sponsorship Director**

The Association Of Surfing Professionals is the governing body for professional surfing worldwide. I was the Pro Surfers representative on tour. I was the middle negotiator for all problems and communications between the Surfers and the Administrative body and wrote and actively sought Corporate sponsorships for both the Association and Professional Contests. I served as Contest Director on a number of International Events.

**Australian Professional Surfers Association (APSA) December 1985 --March 1990**
**Part Time Director**

The Australian Professional Surfers Association is the local governing Association for the development of Professional Surfing in Australia and the regional representative for the World body the ASP. My responsibilities were to raise sponsorship money for a fully funded National circuit which was the satellite events that helped Australian and International surfers progress to the World Pro Tour. I organized a national program of contests and established a point system for advancement and selection to the World Tour.

**Education**

**1984**    Bachelor of Laws/ Economics (BEc/LLB)
         University of New South Wales

**1979**.   Port Macquarie High School NSW 1979

**Associations**

    American Bar Association (ABA) Associate Member
    ABA Intellectual Property Law Section Member
    ABA Civil Rights and Social Justice Member
    ABA Dispute Resolution Member
    Member International Model Alliance
    ModeI - Kartel International Advisory Board

## STEPHEN CHAMBERLIN TESTIFYING EXPERIENCE TABLE

| In the Matter of | Court | Representing | Testimony |
|---|---|---|---|
| *Nouveau Model and Talent Management vs. Disguise Inc., SC111112* | Los Angeles Superior Court (Central) – Stanley Mosk Courthouse | Plaintiff | Trial Testimony Deposition |
| *Timed Out, LLC vs. 13359 Corp. BC583739* | Los Angeles Superior Court (West) – Santa Monica Courthouse | Plaintiff | Trial Testimony Deposition |
| *Timed Out, LLC v. Tru Hospitality Group, LLC, et al. BC586726 -* | Los Angeles Superior Court (Central) - Stanley Mosk Courthouse | Plaintiff | Trial Testimony Deposition |
| *Timed Out, LLC v. Midway Venture LLC, d/b/a Pacer, et al Case No. 37-2015-002122-CU-NP-CT:* | Superior Court of California, County of San Diego (Central) | Plaintiff | Deposition |
| *Joanna Krupa; ET AL., v. RPM Dining, LTD. d/b/ a The Yellow Rose and RPM Dining, LLC, D-1-GN-15-003207* | District Court Travis County, Texas 419 Judicial District | Plaintiff | Deposition |
| *Sandra Valencia; ET AL., v The Landing Strip Gentlemen's Club D-1-GN-15-004750* | District Court Travis County, Texas   53rd Judicial District | Plaintiff | Deposition |
| *Jamie Faith Edmondson; ET AL., v Caliente Resorts, LLC, d/b/a Caliente Vacation Club, 8:15-CV-02672-SDM/TBM* | United States District Court Middle District of Florida Tampa Division | Plaintiff | Deposition |
| *Lena Posada, et al. v. Club Hospitality II, Inc.d/ b/a Lipstick Gentlemen's Club; et al. No. DC. - 15 - 13275* | 116th Judical District Court, Dallas County, Texas | Plaintiff | Deposition |
| *Brooke Banx; et al. v. TLC Beverages Of Dallas, Inc., d/b/a The Men's Club Dallas, et al.,* | 116th Judical District Court, Dallas County, Texas | Plaintiff | Deposition |
| *Amber Lancaster, et al. v Ocala Hospitality Group, LLC d/b/a Cowboys Saloon d/b/a Cowboys Ocala d/b/a The Colosseum* | United States District Court Middle District of Florida Ocala Division | Plaintiff | Trial Testimony |
| *Carissa Rosario, et al. v LA Place, INC., d/b/a Gossip Gentlemen's Club, and Nickolas Alleva, 2:15-cv-07104 (JMA) (ARL)* | United States District Court Eastern District of New York | Plaintiff | Deposition |
| *Toth vs Murray Enterprises 15-CV-8028-NRB* | United States District Court Eastern District of New York | Plaintiff | Deposition |
| *Taylor et al v Trapeze Management LLC et al 0:17-cv-62262- KMM* | United District Court Southern District of Florida | Plaintiff | Deposition |
| *Timed Out LLC V Prisma Entertainment BC663581* | Superior Court of the State of California County of Los Angeles, Central District | Plaintiff | Deposition |
| *Timed Out LLC v Red Tie LLC BC664917* | Superior Court of the State of California County of Los Angeles, Central District | Plaintiff | Deposition |
| *Burciaga et al v Flash Dancers Inc. 3:16-cv-393-J-32JRK* | United States District Court Middle District of Florida Jacksonville Division | Plaintiff | Trial Testimony |
| *Edmondson et al, v Velvet Lifestyles, llc et al. 15-24442-CIV-Martinez/Louis* | United States District Court Southern District of Florida | Plaintiff | Trial Testimony |
| *Case: Gibson et al v Faneuil Entertainment, Inc. (Cheetah Clubs) 50-2015-CA-009211xxxxMB-01* | Fifteenth Judicial Circuit in and for Palm Beach County, Florida | Plaintiff | Deposition |
| *Gibson et al v Cowboys Saloon Gainesville 1:18-cv-138-AW-GRJ* | United States District Court Northern District of Florida Gainesville Division | Plaintiff | Trial Testimony |
| *Geiger et al V Creative Impact, Inc d/b/a Bandaids Showclub.  2:18-cv-01443-PHX-JAT* | United States District Court District of Arizona | Plaintiff | Deposition |
| *Cheri et al v A-Q-B, LLC.,d/b/a Babes Club 6:19-cv-00372* | United States District Court Western District of Texas | Plaintiff | Trial Testimony |
| *Ratchford et al V AEG Ventures, llc. (Atlantis) 1:17-cv-07368* | United States District Court Northern District of Illinois Eastern Division | Plaintiff | Deposition |
| *Gray v Ultra Gentlemen's Club Civil Action No. 502017CA004669* | Circuit Court of the 15th Judicial Circuit Palm Beach County Florida | Plaintiff | Trial Testimony |

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

ROSA ACOSTA

Plaintiffs,

- against -

RESTAURANT, BAR AND NIGHTCLUB OWNER
d/b/a FARAONES NIGHTCLUB

Defendants.

Case No.: 2:18-CV-17710-MCA-MAH

IMAGE EXPERT WITNESS ®
CONSULTING AND VALUATION

TERRAZOS SUITES
1861 NW SOUTH RIVER DRIVE
#1207
MIAMI, FL. 33125
PHONE: (310) 666-3629

CONFIDENTIAL

| SECTION | PAGE |
|---|---|
| i. Professional Background | 3 |
| ii. Assignment Summary and Opinion | 4 - 5 |
| iii. Methodology | 6 - 15 |
| a. Definitions | 6 - 7 |
| b. Primary Factors considered by Model before consent for job | 8 |
| c. Establishing a Model's Day Rate | 9 |
| d. Points to be considered | 10 - 11 |
| e. Additional Factors in Establishing Fair Market Value | 12 |
| f. Assessment of Damages | 13 |
| g. Categories of Documents and Information considered | 14 |
| h. Additional Professional Considerations | 15 |
| iv. Damages Table | 16 |
| Professional Experience | 17 - 18 |
| Education | 18 |
| Associations | 18 |
| Expert Testifying Experience | 19 |

| Individual Fair Market Value Analysis | 20 - 34 |
|---|---|
| Rosa Acosta | 21 - 34 |

| Reference Material | 35 - 60 |
|---|---|
| Examples of Defendants' advertising | 36 - 43 |
| Model's examples of imagery and work product | 44 - 45 |
| Documents and Reference Material | 46 - 60 |

STEPHEN CHAMBERLIN
IMAGE EXPERT WITNESS
TERRAZOS SUITES
1861 NW SOUTH RIVER DRIVE
#1207
MIAMI, FL. 33125

---

## I. PROFESSIONAL BACKGROUND

I have worked as a full-time agent in the Model and Talent industry since 1989. As a consequence of my extensive knowledge and experience in the industry, I am frequently called upon to speak at national and international modeling conventions and have been a keynote speaker at more than 30 conventions including Model Search America, the International Model and Talent Association and Paula Palm Conventions.

I have served as Agency Director at LA Model Management, one of the world's largest and most respected talent agencies, founded Warning Management Inc., a talent and model agency that I subsequently took public and I am the owner and director of Rumblestorm Management, a worldwide model sourcing and management company. Rumblestorm Management acts as a professional paid scout and development platform for Model worldwide. I work with Michele Pommier Model as agent and scout and my key functions are to quote, negotiate and oversee rates, work and career development for all talent that is represented by Michele Pommier Model and Rumblestorm on a regular basis.

In my capacity as an agent, I have represented over 5,000 Model, personally discovered, started and developed the careers of more than 300 Model, negotiated over ten thousand contracts, day rates and usages and have billed personally or overseen bookings in excess of $100 million. My client associations include Conde Nast worldwide, Nordstrom, Chanel, Tom Ford, Revlon and Tiffany's WPP Group among others.

As a consequence of my well established industry reputation, I have been appointed to represent internationally known Model and talent to establish their crossover careers. Talent includes Brooke Shields, Eva Longoria and multiple Miss Universe winners and contestant winners. Model include Claudia Schiffer, Tyra Banks, Michaela Bercu, Lauren Hutton and Carries Otis, creating the then new concept of 'SuperModel. In respect of acting talent, I have identified significant market opportunities at the beginning of their careers for actors and actresses including Ali Larter, Dennis Rodman, Eric Roberts, Renee Russo, Jessica Biel, Elizabeth Berkeley, Denise Richardson, Liv Tyler, Paula Barbieri, and Julianna Margulies. I have represented Victoria Secret Angels Alessandra Ambrosio, Jasmine Tookes and Jessica White and served as agent for Paris Hilton and was instrumental in the development of Ms. Hilton's brand.

With 30 years experience as a full-time professional within the Model and Talent Industry, I am very familiar with the current market rates for Model of all standing. I am well regraded for my expertise in the area of image use, the valuation of image uses, model and public personality career valuation and the effective rates of work and valuation.

## II. ASSIGNMENT OPINION SUMMARY

I have been retained by Pinilis Halpern, LLP. on behalf of Rosa Acosta (hereinafter referred to as, "Model") to evaluate and value retroactively the compensation Model would and should have received for the use of their respective images by Restaurant, Bar and Nightclub Owners doing business as Faraones Nightclub ("Defendants").

I am informed and do believe the Use by the Defendants and the lack of consent by each Model is not in dispute by the Defendants.  Model has advised me that at no time has the Defendants approached them individually, or collectively, or approached or negotiated with the any of the Model's agents or representatives to seek consent for the use of any images or likeness of the Model, to be used in connection with the Defendants' business activity or any other form of use of the Model's images from which the Defendants would derive a benefit from.

Based upon my professional experience in the industry I have been asked to determine the fair market value of the Model's images used by the Defendants in connection with the social media accounts for the Defendants' clubs.

My opinions are based on a thorough review of the images and of supporting documentation, discussions with  Model as well as agency representatives and other individuals in the modeling and talent industries as outlined in this Report, assessment of current career station and personal factors that would impact a fair market value negotiation. It is my expert opinion that the Model has sustained quantifiable harm and injury as a result of Defendants' use of the Model's images. In particular, Model was, at a minimum, denied the payment she would have received if Defendants had obtained her consent to use her image.

My opinions as well as the methodology for calculating damage to Model and results of my review are detailed in this Report. I have analyzed the Model when assessing fair market value and damage to professional standing due to use of her image.

Determining the fair market value of the Defendants' use of the Model's images necessarily requires me to attempt to recreate a negotiation process that did not occur. As such, my opinion as to the fair market value takes into consideration the factors normally considered by talent, clients and their respective agents and representatives when negotiating the value of the use of the Model's images to promote the clients' goods or services. I must additionally account for the value inherent in the ability of  the Model to control the course and selection of business opportunities and, thus, the direction of her career which, in this case, was taken away by Defendants. These considerations are always a component of the process by which the parties to a negotiation would determine the value of the use of the Model's image, and so must be considered when establishing fair market value.

In this case, the Defendants circumvented the negotiation process altogether.

As a consequence of the Defendants bypassing all levels of negotiation with the Model, we must retroactively assess the factors that would be accounted for in the proper contractual negotiation process. This includes the status of the Model, the nature of the use and true harm to the Model in not being able to control the way in which her image was used.

**Set forth in Table below, is my opinion that the fair market value of all presently known image infringements, against Faraones Nightclub, NJ, in the aggregate, totals $20,000.**

It is important to note that my results are based on a number of factors and are estimations in support of actual damages sustained by the Model but do not reflect amounts at which the Model would have actually accepted to participate, endorse or consent to be photographed or portrayed in such a manner as used by Defendants. I understand that most Model would not accept the assignment at any level of compensation.

The foregoing opinions, analysis, and conclusions are based upon the documents and information I have reviewed as of the date of this report, as well as my experience in the Modeling industry.

I expressly reserve the right to amend, supplement or modify this Report and the opinions expressed herein within the limits prescribed by the Court based upon new information provided to me.

I further expressly reserve the right to prepare a rebuttal report in the event that the Defendants retains an expert who is qualified to, and does, challenge any aspect of this Report.

III. METHODOLOGY

### a. DEFINITIONS

The following is a list of basic definitions of concepts used in the Model and Talent Industry. Though comprehensive the list is not absolute and terms, rates, services, fees vary. Factors relating to the services of the model and talent will vary and are unique in each case based on all relevant considerations relating to a particular model, the client and product, event or service advertised and to enable the negotiation by the agent for the highest rate possible given the type of product, service or customer/consumer being advertised.

**For purposes of my professional Reports,** the following terms are applied as generally understood and accepted within the model and talent industry.

**Usage** includes the way and method of use and distribution of images including but not limited to advertising, social media, third party promotion, branding, Billboard displays, coupons and more.

**Advertising** is use of an image to promote a business, company or event, on a website owned, controlled or contributed to by a client or in a magazine or publication or anywhere the business or product name of the client is associated or attached with the image.

**Social Media** includes, but is not limited to, Facebook, Twitter, Instagram, Google +, Yelp, YouTube, Snapchat and Tumblr.

**Third Party Promotion** includes use of an image to promote a third party product, company, event or consumer experience.

**Branding** includes either manipulating an image to effectively "brand" a company and suggest a model is employed by the entity, or attaching dialogue or hash tag (#) which references, describes, labels or effectively categorizes a model and associates her/him to the particular product, business, or consumer experience, or *similar* products, business and consumer experiences.

**Coupon** includes, but is not limited to, use of an image to offer discounts for entry, participation to a club, party or event or discounts on products.

**Extra usage** would include billboards, flyers, TV usage, movies, downloads, posters, hangtags, banners and decorations.

**Unauthorized User** is a person, company, association or other entity or group of entities using the Model's image(s) without express authority of the model or her agent.

**Exclusivity** - where exclusivity is sought, and to restrict a model from working for a competing product a higher rate would be negotiated to offset loss of work from similar clients.

**Sensitive Subject Matter** - Certain products and services considered to be less reputable, unseemly or embarrassing, resulting in a higher degree of compensation for talent agreeing to the use of their images with such products or services. For example, products and services relating to sexual or reproductive health, incontinence, adult entertainment, politics and communicable diseases. By way of example, an advertisement for a hemorrhoid cream would attract a large premium.

**Exposure** - How broadly a Model's likeness will be circulated is taken into consideration in negotiating the fee.

**Length of Exposure of Usage** - the period of use, and any renewals or rollovers - a renegotiation or 'rollover' fee would be applied to usage longer than 12 months. There is no minimum usage period.

**Fair Market Value** is an agreed price between a willing seller (the model and/or agent) and a willing buyer.

**Total compensation -** <u>every</u> form of usage is negotiated and is **negotiated before** the shoot. Usage is determined upon the ways the image(s) taken from the shoot are used. By way of example, distribution by way of Billboard would pay more, if the image was placed on posters or banners, flyers, TV usage, movies, downloads, posters, hashtags, hangtags and decorations additional fees would be incurred.. The general rule of industry is and as referenced in *The White Book Guide to Model Fees* is **an additional day rate for each usage.** (Copy of The White Book is attached) Certain usages would command more and for every " Usage" a specific "Time period" would be specified. (*Annex 1)

It is acknowledged that with this as a starting point for a negotiation there may in some cases be a negotiated lower rate under certain circumstances. Multiple repeat bookings, loyal advertiser, exclusive bookings and other factors could possibly be circumstances for which a lower rate may be negotiated.

b. PRIMARY FACTORS CONSIDERED BY MODEL BEFORE CONSENTING TO A JOB

1. The job/exposure/association with product and/or resulting images or tear sheets helps their career,
2. Compensation / payment.

Once a job has been negotiated (day rate plus usages) and the images are used on a website on the world wide web, the number of images from the shoot, the number of times used, the size of the images, the number of times the image was viewed or "liked" and the duration that the images remain available on a site are all factors that are outside the influence of the agent or model.

Once a Model's job has been negotiated and shot the success of a campaign, the number of views, likes and distribution are the responsibility of the client. Once an image is on the web and associated with an Advertiser the number of views, the number of 'shares', the number of downloads and copies made is generally unknowable.

## C. ESTABLISHING A MODEL'S DAY RATE

The predominant way an authorized user could obtain images for advertising is to negotiate a contract first and arrange a photo shoot. All Usages should be negotiated prior to the actual use taking place. It is critical to note that Model do not sell pre-shot images for Advertising. All advertising for specific products involve a photo shoot.

The basis of all negotiations in the industry is establishment of a "day rate" for work by the model. This is the base rate of compensation (determined by factors listed below) for the Model's time on the day of shoot.

1 - The Model's desirability, based on numerous factors, including the demand for his or her services and relevance to product.

Model and Talent spend considerable years to develop their brand (brand or image) which is often based on fitness, beauty and sexuality. Social Media followers, star rating, current press coverage, Marriage and personal relationships, current published work, TV appearances, Movie appearances and Social Media attention must be considered.

The number of Social Media followers has become extremely important in consideration of a Model's's bookings. Endorsements for posts on their social media platforms is directly dependent upon the number of followers and audience engagement. A client's audience and customers recognition grows with the Model's growth in Social Media numbers as does the income for the commercialization of their image.

For many other factors listed there is no quantitive measure available to add or detract value to a Model's day rate but should be considered in any negotiation. Much the same as a sportsman negotiating a new contract would consider the past seasons factors such as home runs hit, touchdowns scored, sacks achieved, etc.

2 - The Model's work history, such as prior associations, appearances, endorsements, and advertisements including rates established for the commercialization of their image.

The Model's work history for an agent is the basis to help establish a "day rate" to quote in negotiations for future assignments. It is important to note that past 'day rates' help establish a basis for future assignments but Model are constantly trying to raise their rates. Past rates will apply to similar product but each new assignment's rates will depend upon the Product to be advertised and factors as listed below.

3 - The nature of the business seeking a Model's service, including but not limited to the type of product, service or customer experience.

d. **POINTS TO BE CONSIDERED**

**DAY RATE**

The Day Rate is the basis of most model assignment negotiations.  Model do not sell images previously shot to clients to be used in their Advertising. The only legal way Defendants could obtain the images they require is to 'book' the model for a photo shoot after negotiations of rates and usages either directly with the Model or through an Agent representing the Model.  A Day Rate is also the basis of compensation for a model. Time spent on set is calculated as the Day Rate. In this case the Defendants did not engage the Model in a photo shoot but misappropriated the images. The Day Rate is calculated into Fair Market Value.

The product being advertised is the main factor considered to determine a day rate. The "Product" being advertised by Defendants is the Club, their events, parties, food and alcohol.

The demand for a model's service, her history of work, her 'Fame', her Social Media standing and her suitability to represent the product and compatibility with the Advertiser's vision for their marketing plan are the next considerations.

Most Advertising work for a Night club is not an assignment that enhances a model's career and resulting images are not something they would display in a portfolio. The possible damage to a model's career that must be considered is if the Night Club's use of the model's image goes against the Model's own brand, style, lifestyle or competes with other work or affects or taints attitudes from future potential clients.

Model accept assignments that help their careers such as magazine work that raises their profile and supplies well produced, images mostly shot by accredited photographers. Model accept work that pays Market Value rates in line with the product they are advertising.

The assignment with Defendants' clubs does not 'benefit' the Model career and thus would only be considered for the monetary payment.

All of the Model in this case have shown careers and resultant earnings based on the commercialization of their image. The Day Rates I have quoted are all based on the fact that the Model herself is the Product but the rates vary according to the Model's work history. Rather than just 'creating' a day rate I have tried to draw as straight a line from previous earnings for one day work as possible. The Day Rates I have considered are logically in the highest range as earned by the model.

Once the Day Rate for each model has been established, the further costs to the Advertiser depends upon the "Usages". A Day Rate for each of the Usages is the basis of most negotiations in the Model Industry.

It must be noted that Usages as described here are categories of use not the number of times an image is posted. In fact once a negotiation as taken place and a contract agreed to, images produced from the photo shoot can be used in the particular Usage Categories an unlimited time in the agreed time period.

I do not charge a rate for the number of times an image is posted. I quote one day rate for the method of distribution. In this case Social Media is the method of distribution of the Model's images.

Advertising usage is included as the use when attaching the Advertiser's name to the Model's Image and is included in the Day Rate as paid for the model's time on set. This also allows the Advertiser to use the images produced on their business website. In other words an Advertiser can engage the model, produce images, attach their name and use on their website for One day rate total. All other Usages will be negotiated additionally.

"Branding" is a category of use that is included in my Fair Market Valuation and would be negotiated before a model was photographed. Model advertise product. The majority of work performed by the Model in this case have Advertised products such as Clothes, Swimwear, Lingerie, Beverages and beauty products. When the Client mentions 'product' in their descriptions or tagged language or labels or banners it is referring to the product. Defendants' advertising the Model as the product and any reference to the product in these advertisements becomes a personal reference to the Model and is termed Branding. Branding ties the Model to the establishment, makes the advertisement a personal endorsement, implies that the Model will be in attendance at the club, works at the club, is available for patrons of the Defendants Clubs, or describes services that the Model would be performing at the club. Branding use is quoted at a rate equal to the Model's Day Rate and is charged once, no matter how many times "Branding" language is used.

Coupon/ Third Party use is when a Model's mage is used to promote special deals over and beyond the original Product agreement. In the case of Alcohol Advertisement by Name Brand Alcohol these advertisements are closely monitored by the Advertising Counsel. Minimum age of 25 and other factors that can affect a Model's ability to work must be considered. Alcohol Advertising for a model is always a lucrative option for work but a certain degree of exclusivity must be adhered to. Clients do not want to see the same Model endorsing many different brands and it is an agents duty to disclose conflicts to potential Advertisers. Coupon/ThirdParty Usage is quoted at a rate equal to the Model's Day Rate and is charged once, no matter how many times Coupon/ Third Party is used.

Usages and the rates charged for usages are defined and negotiated before the shoot takes place. Usage rates may be calculated and an "all up rate" may be quoted but make no mistake the rates have been calculated and negotiated first based on the quoted 'Day Rate'. Some contracts may not break down the rates determined for usages but those rates have been considered in the Total Rate Charged.

The Model Industry and Photographers representation have been around for over 75 years and the method of negotiations rates , the way Day rates have been determined , usages and the way in which they are charged have also been in use and are still used in nearly every agency in every country around the world. What I have attempted to do is apply  Model Industry Standards to the determination of Fair Market Value in cases of misappropriation and use of images.

Industry Terms and conditions and reference websites are attached in *References below.

e. **ADDITIONAL FACTORS CONSIDERED IN ESTABLISHING FAIR MARKET VALUE.**

The rates that Model's are paid are based upon numerous additional factors including but not limited to the following:

• whether use exclusivity is sought;

• Whether the product or service constitutes or is related to sensitive subject matter.

• the history of the client or industry seeking a Model's services, the style, quality and production of previous advertising and promotions, and the client's history in the hiring of other Model's and celebrities;

• exposure - namely how broadly a Model's likeness will be circulated;

• the type of exposure, or the "**Usage**" of the image;

• the length of exposure of Usage, the period of use, and any renewals or rollovers;

• the nature, duration and location of the actual shoot and production

The Model involved in this matter has categorically stated to me that the assignment with Defendants is one that they would not consider. A day rate for the Defendants' use in a hypothetical negotiation should contain a premium or, at a minimum be equal to the value set by previous commercialization of Model's image in combination with other factors that would influence the actual quoted or negotiated rate for a day's rate. Then applying that day rate as the basis of negotiation to the specific usages as used by Defendants.

In determining the potential impact to a Model's career and future prospects of gaining work from reputable organizations and clients, there are a number of factors that must be taken into consideration. Model invest heavily in time, work and money to build their image and publicity value. Non-negotiated use of their images undercuts these investments, depriving the model of the opportunity to control and craft their own brand as sole owners of their image. This impact would be considered in valuing a Model's rate.

If a Model's image is unilaterally used by an unauthorized User and that party does not pay at least the full market value that the image would otherwise achieve in a bilateral negotiation, the model is immediately adversely affected financially.   In the case of the image being used to promote an industry or product that does not enhance the Model's known and accepted image, the future income earning potential of the Model could be severely, and in some cases permanently, damaged thereby destroying the future career prospects of the Model. Model and clients take the potential for such harm into account when negotiating a Model's rate.

If a User opts not to engage in arms-length negotiation for the image and, instead, uses the Model's image without consent, an assessment of financial damages to the model must include at a minimum, the fair market value for the image had it been negotiated properly. In a real market negotiation the model or agent would need to consider the possibility of loss to future earning capacity and possible damage to reputation, of being associated with a product that is often deemed unsavory. In an effort to provide a conservative assessment of the fair market value of the Model's images, no additional 'premium' has been added. However the Defendants 'product' has been considered in the establishment of Model's hypothetical negotiated day rate.

The timing or context of the use of the photographic images of the model, the product advertised, the Usages and the distribution of the images to various markets all must be taken into consideration in the assessment of damages and the number of images used and the usage of each image must be taken into account for the purpose of establishing a fee in an arms-length negotiation. For each model a fair market fee for the use of each image used, taking into account the income history the model derived from properly negotiated work over the course of her career, as well as the their work quality, experience, exposure, and duration of career forms part of the calculation of the day rate. The determined fee would be that which is reasonable in light of industry standards, the way each Model's image was used and the nature of the business that has misappropriated the image.

g. CATEGORIES OF DOCUMENTS AND INFORMATION CONSIDERED IN CALCULATING DAMAGES

In conducting the analysis to complete an assessment of damages, it is necessary to review, consider and rely upon the images used and their specific usage by the Defendants together with the perpetual period of time during which each offending image was used (*i.e.*, once posted, the images remain on the internet or social media in perpetuity), alterations to any of used images, the media in which each image was used or disseminated, and the mode and scope of distribution in various markets nationally and worldwide on the web. My understanding that none of the images were taken down prior to the beginning of litigation activity between the parties.

In conducting an analysis in preparation of a report it is further necessary to review, consider and rely upon the type and caliber of past clients that have employed each model as well as factors determining and affecting each Model's future earning capacity such as earning history, development, growth, positioning, experience, current exposure, name recognition, personal publicity, social media profile and extensive web presence, market demand, and complementary employment.  In addition to having extensive knowledge and experience in the modeling industry it is necessary to have, to the extent available, considered such documents as modeling contracts and agreements, contractor 1099 forms, employee W-2 forms, earnings statements, releases and related records. Discussions with the Model and best recollection of work and earnings are discussed and considered where invoices, documents, contracts or payment records are not available but the resulting work product is available.

Discussion with the current agent or past agents representing the Model when available is valuable in assessing the value of a Model's image. This process and knowledge as to the history of rates, com-parables, career planning, special circumstances, exclusivities, competing products and name endorsements are integral to determining and negotiating the value of a Model's image. I have attempted to contact where available all agents or representatives, managers, booking companies or attorneys that have knowledge and details that are important in establishing a working day rate with regards to the Defendants product.

Review, consideration and reliance upon information and literature relating to the Defendants, history, profile, and focus on promoted events, including but not limited to social media promotional material is also required to gain an understanding of the specific product or consumer experience that the Defendants advertise. Use of the Model's images (*eg:* club, parties and event promotions) implies that the model is a willing and voluntary participant and endorser of the advertisements and the use implies that the model necessarily understood and supported the Use by Defendants and the consumer experience being advertised. Such use can imply that each model took part in or would be present at the Defendants' parties or events in fulfillment of this advertised consumer experience.

e. ADDITIONAL PROFESSIONAL CONSIDERATIONS

In conducting the analysis and preparation of a  Report, I further review, consider and rely upon my 28+ years of involvement in the model industry, discussions with numerous past and present agents working in agencies all over the world. I review various booking terms and conditions set down by model agencies operating today (reflective of nearly every agency operating worldwide) and handbooks and guidelines published by advisory bodies such as The Association of Model Agents (AMA), The Trade Association of The UK Model Industry. In estimating the compensatory, or actual, damages for each individual, I quantify the fair market value for the use by Defendants of each Model's images over her strong objection that should require a premium to be paid during negotiations.

In determining the damage to the Model from the use by Defendants of the Model's images. I employ the normal model industry practice and process when quantifying fair market value for use of Model's time to photograph or film and resulting images and the charges to a company or other entity that is interested in contracting the Model's services. Fair market value of a product or service is the agreed price between a knowing, voluntary and willing seller and a knowing, voluntary and willing buyer, with no interference, disruption or manipulation by a third party. Fair market value is *not* equivalent to the value that a buyer would unilaterally offer and pay for use of an image to promote a product, service or consumer experience where the seller – in this case the Model  – either does not know about the transaction or objects to or rejects the proposed transaction. In other words, a hypothetical buyer like the  Defendants in this case would not be able to unilaterally set the fair market value of the Model's images in a transaction, particularly where, as here, there is not a willing seller. Nor, would the seller be able to unilaterally set the price for the Model's image. If that were the case, I understand that the Model in this case would have set prices far higher than my assessment of rates. ( Assuming the Model would agree to Defendants' use at any price).

Comparison of rates paid to Model for assignments worked where they have consented to the job, agreed with the product and have had a rate negotiated before the assignment present significant differences with the use of their images by Defendants. As in any negotiations this product would have been a defining point in any negotiations to hire the Model.

In assessing damages I have not included a fee or rollover based on time. Rarely, if ever, is there  a contract with Unlimited Time for use allowed. Many of the images used by Defendants may have remained on Social Media for significant periods of time, with no indication that the Defendants would have intended to remove the imagery before being contacted in this litigation. Thus Defendants had effectively used the Model's images for an "unlimited" duration . In my experience there would be a renegotiation or rollover (repayment of original fee) at minimum every year of use.


In development of my report I have conferred with certain modeling agents in the main modeling markets of the US.

iv. **DAMAGES TABLE**

| SECTION | DAMAGES |
|---|---|
| Rosa Acosta | $20,000 |

_____

**Stephen Chamberlin**

06/22/2021

_____

**Date**

Professional Experience

Stephen Chamberlin
TERRAZOS SUITES
1871 NW SOUTH RIVER DRIVE
P 608
MIAMI, FL. 33125

**Rumblestorm Management January 2009 to present**
**Owner - Director**

Rumblestorm Management is a worldwide sourcing and management company that operates as a paid scout and development platform for Model's working all over the world. Currently managing Model's both male and female in the US, France, Great Britain, Spain, Germany, Japan, Singapore, Italy, Australia and New Zealand.

Agencies that I am actively engaged and working for and with include but not limited to, IMG Model's Worldwide, DNA Management NY, Major Model's Worldwide, NY Model's NY, Elite NY, Ford Model's NY, Society Management NY, Women NY, LA Model's LA, M Management LA, Next Model's Worldwide, Silent Model's Paris, Premier Management London, Select Model's London and Storm Management London.

I place Model's with these and other agencies in multiple countries, book, negotiate, invoice, collect commissions, source tear sheets and monitor usage of jobs.

**Michele Pommier Model**

**February 2016 to March 2019 Agent / Scout**

Michele Pommier Model's is one of the oldest, most established and respected agencies in the United States. My involvement as an agent is to add my international experience and negotiating skills to expand bookings, secure representation of established Model's and to scout and develop new talent.

**Warning Management Inc. November 1998 to August 2008 Founder - Partner - Director**

A full service management company representing fashion Model's, actors, commercial talent, musicians, bands, photographers, directors, brands and companies. Revenues are primarily derived from commissions paid by clients, from engagements including but not limited to, bookings, endorsements, sponsorships, commissions, residuals, exclusivities and royalties. The mediums worked in include but not limited to, Print, Television, Videos, Packaging, Billboards, Point of Sale, Corporate Videos, Appearances, Speaking Engagements, Film, Events, Event Management, Organization, Consultancies and Negotiations.

My responsibilities were total management and hands on involvement in every facet of the company. As director and signatory for the company, I had a complete working knowledge of every negotiation, deal and client that we represented. I was responsible for not only branding and development of the major clients but also for branding and development of the company. I built the company from one employee and zero revenue into a publicly traded company with revenues of over $30 million per annum.

**LA Model Management (Los Angeles, CA)**

**NY Model Management (New York, NY) December 1991 to May 1998**
**Agency Director**

LA model Management is one of the world's oldest largest and most respected agencies. I represented Model's, commercial talent, actors, production services, runway, hair and make-up artists and casting services. My responsibility was the development of talent and the International marketing of the company to clients worldwide. I established the first corporate client endorsements by actors and opened a whole new industry within an industry. I developed Model Searches and TV shows that were fully sponsored and are still in production now.

**Spott Model Management (Sydney Australia) January 1989 to August 1991**
**Agency Director**

Spott Model's was a boutique agency in Sydney specializing in the development of Model's for the world market. In the two years working I sent over a hundred Model's out to various agencies worldwide and represented more than two hundred international Model's on their visits to Australia.

**Association of Surfing Professionals. (ASP) December 1989 to March 1990**
**Tour Representative / Sponsorship Director**

The Association Of Surfing Professionals is the governing body for professional surfing worldwide. I was the Pro Surfers representative on tour. I was the middle negotiator for all problems and communications between the Surfers and the Administrative body and wrote and actively sought Corporate sponsorships for both the Association and Professional Contests. I served as Contest Director on a number of International Events.

**Australian Professional Surfers Association (APSA) December 1985 ---March 1990**
**Part Time Director**

The Australian Professional Surfers Association is the local governing Association for the development of Professional Surfing in Australia and the regional representative for the World body the ASP. My responsibilities were to raise sponsorship money for a fully funded National circuit which was the satellite events that helped Australian and International surfers progress to the World Pro Tour. I organized a national program of contests and established a point system for advancement and selection to the World Tour.

**Education**

**1984**    Bachelor of Laws/ Economics (BEc/LLB)
             University of New South Wales

**1979**.   Port Macquarie High School NSW 1979

**Associations**

     American Bar Association (ABA) Associate Member
     ABA Intellectual Property Law Section Member
     ABA Civil Rights and Social Justice Member
     ABA Dispute Resolution Member
     Member International Model Alliance
     Model - Kartel International Advisory Board

**STEPHEN CHAMBERLIN TESTIFYING EXPERIENCE TABLE**

| In the Matter of | Court | Representing | Testimony |
|---|---|---|---|
| *Nouveau Model and Talent Management vs. Disguise Inc.*, SC111112 | Los Angeles Superior Court (Central) – Stanley Mosk Courthouse | Plaintiff | Trial Testimony Deposition |
| *Timed Out, LLC vs. 13359 Corp.* BC583739 | Los Angeles Superior Court (West) – Santa Monica Courthouse | Plaintiff | Trial Testimony Deposition |
| *Timed Out, LLC v. Tru Hospitality Group, LLC, et al.* BC586726 - | Los Angeles Superior Court (Central) - Stanley Mosk Courthouse | Plaintiff | Trial Testimony Deposition |
| *Timed Out, LLC v. Midway Venture LLC, d/b/a Pacer, et al* Case No. 37-2015-002122-CU-NP-CT: | Superior Court of California, County of San Diego (Central) | Plaintiff | Deposition |
| *Joanna Krupa; ET AL., v. RPM Dining, LTD. d/b/ a The Yellow Rose and RPM Dining, LLC,* D-1-GN-15-003207 | District Court Travis County, Texas 419 Judicial District | Plaintiff | Deposition |
| *Sandra Valencia; ET AL., v The Landing Strip Gentlemen's Club* D-1-GN-15-004750 | District Court Travis County, Texas    53rd Judicial District | Plaintiff | Deposition |
| *Jamie Faith Edmondson; ET AL., v Caliente Resorts, LLC, d/b/a Caliente Vacation Club,* 8:15-CV-02672-SDM/TBM | United States District Court Middle District of Florida Tampa Division | Plaintiff | Deposition |
| *Lena Posada, et al. v. Club Hospitality II, Inc.d/ b/a Lipstick Gentlemen's Club; et al.* No. DC - 15 - 13275 | 116th Judical District Court, Dallas County, Texas | Plaintiff | Deposition |
| *Brooke Banx; et al. v. TLC Beverages Of Dallas, Inc., d/b/a The Men's Club Dallas, et al.,* | 116th Judical District Court, Dallas County, Texas | Plaintiff | Deposition |
| *Amber Lancaster, et al. v Ocala Hospitality Group, LLC d/b/a Cowboys Saloon d/b/a Cowboys Ocala d/b/a The Colosseum* | United States District Court Middle District of Florida Ocala Division | Plaintiff | Trial Testimony |
| *Carissa Rosario, et al. v LA Place, INC., d/b/a Gossip Gentlemen's Club, and Nickolas Alleva,* 2:15-cv-07104 (JMA) (ARL) | United States District Court Eastern District of New York | Plaintiff | Deposition |
| *Toth vs Murray Enterprises* 15-CV-8028-NRB | United States District Court Eastern District of New York | Plaintiff | Deposition |
| *Taylor et al v Trapeze Management LLC et al* 0:17-cv-62262- KMM | United District Court Southern District of Florida | Plaintiff | Deposition |
| *Timed Out LLC V Prisma Entertainment* BC663581 | Superior Court of the State of California County of Los Angeles, Central District | Plaintiff | Deposition |
| *Timed Out LLC v Red Tie LLC* BC664917 | Superior Court of the State of California County of Los Angeles, Central District | Plaintiff | Deposition |
| *Burciaga et al v Flash Dancers Inc.* 3:16-cv-393-J-32JRK | United States District Court Middle District of Florida Jacksonville Division | Plaintiff | Trial Testimony |
| *Edmonson et al, v Velvet Lifestyles, llc et al.* 15-24442-CIV-Martinez/Louis | United States District Court Southern District of Florida | Plaintiff | Trial Testimony |
| *Case: Gibson et al v Faneuil Entertainment, Inc. (Cheetah Clubs)* 50-2015-CA-009211xxxxMB-01 | Fifteenth Judicial Circuit in and for Palm Beach County, Florida | Plaintiff | Deposition |
| *Gibson et al v Cowboys Saloon Gainesville* 1:18-cv-138-AW-GRJ | United States District Court Northern District of Florida Gainesville Division | Plaintiff | Trial Testimony |
| *Geiger et al V Creative Impact, Inc d/b/a Bandaids Showclub.* 2:18-cv-01443-PHX-JAT | United States District Court District of Arizona | Plaintiff | Deposition |
| *Cheri et al v A-Q-B, LLC.,d/b/a Babes Club* 6:19-cv-00372 | United States District Court Western District of Texas | Plaintiff | Trial Testimony |
| *Ratchford et al V AEG Ventures, llc. (Atlantis)* 1:17-cv-07368 | United States District Court Northern District of Illinois Eastern Division | Plaintiff | Deposition |
| *Gray v Ultra Gentlemen's Club* Civil Action No. 502017CA004669 | Circuit Court of the 15th Judicial Circuit Palm Beach County Florida | Plaintiff | Trial Testimony |

xiv. Individual Fair Market Value Analysis

ROSA ACOSTA

**Background/Bio**

Rosa Acosta is a Dominican classical ballet dancer, model and actress. Ms. Acosta started her classic ballet studies at the age of four at the Centro de la Cultura in Santiago, Dominican Republic. Ms. Acosta later moved on to the Institute of Arts where she excelled as one of the most gifted students of the academy. After graduating with honors from the ICA and the Ballet School of Norma Garcia with a Bachelor in Art with a mention to Classic Ballet, she became part of the Dominican Nacional Ballet as the youngest soloist member in 2002. Partaking in all major classic and modern shows in the Dominican Republic, she was nominated twice by the Secretaria de Estado de la Juventud for her work in the category of Cultural Development.

Ms. Acosta initiated her modeling career in 2004, appearing in magazines and television for prestigious Dominican enterprises. Ms. Acosta moved to the United States in 2006 and has since built a career featuring in magazines, ( Show, King, Black Lingerie, Maxim,) on radio and TV programs, commercials, numerous music videos and was the face of Nine5 Eyewear and shot with Terry Richardson for Supreme magazine.

Ms. Acosta has developed her brand into a small empire with Fragrances, Clothing, Fitness and a physical Store.

Ms. Acosta has over **5 million** social media followers.




: BRAND : ROSA ACOSTA
FOR WOMEN

Born and raised in the Dominican Republic, Rosa started classical ballet studies at the age of four at the Centro de la Cultura in Santiago. She later moved on to the Instituto de Cultura y Arte (ICA) where she excelled as one of the most gifted students at the academy. Upon graduating with honors from ICA and the Ballet School of Norma Garcia with a Bachelor's Degree in Art with mention to Classical Ballet, Rosa joined the Ballet Nacional Dominicano as the youngest soloist member in 2002. As a dancer and actress, she performed in all major classical and modern shows including Don Quixote, The Nutcracker, Swan Lake, Sleeping Beauty, Diana & Acteon, Carmen, Paquita, Coppellia, and Victor Victoria (musical). The rising star was nominated twice by the Secretaria de Estado de la Juventud for her work in the Cultural Development category.

Rosa Acosta embarked on a modeling career in 2004, appearing in magazines and TV commercials for the most prestigious Dominican enterprises. In 2006, she decided to leave home and join her mother in the United States where she continued work as a model and actress, performing in music videos for artists including Aventura, Alexis y Fido featuring Tobby Love, Coscuello, Jowell y Randy, Baby Ranks, Fuego, LDA, Omega, Amarfis y la Banda de Ataque and more. Her career took a major turn when she taped a series of videos showcasing her amazing flexibility as a professional dancer. The stretching videos garnered millions of views on YouTube and other websites, launching her into the national spotlight and catching the attention of elite Hip-Hop artists such as Kanye West who invited her to be a lead model in the music video for Drake's hit song "Best I Ever Had." Her career skyrocketed and she instantly became a celebrity vixen, appearing in dozens of other videos with the most famous Rap and R&B artists like Chris Brown featuring Juelz Santana, Mario featuring Gucci Mane and Sean Garrett, 50 Cent, P. Diddy and Dirty Money, Mike Posner, Soulja Boy, Snoop Dogg, Lil Wayne, Swiss Beats, Jamie Fox, Busta Rhymes and Booba (one of the most famous rappers in France).

ROSA BY ROSA ACOSTA

"ROSA" By Rosa Acosta is a Signature fragrance, designed to invigorate the senses, with a crisp, clean, spa like experience draped with an illusion of tropical fruit perfect for the active woman.

AVAILABLE NOW FOR $65.00
ROSAACOSTAFRAGRANCES.COM

DISTRIBUTED BY / DISTRIBUE PAR:
GSC PLANET MCNAIR  FRAGRANCES, LLC
NEW YORK, NEW YORK 10001

REQUEST.INFO@GLOBALSCENTSANDCONCEPTS.COM

GLOBAL
SCENTS & CONCEPTS

## Consider;

All relevant points as listed above.

- Ms. Acosta is a full-time model/ Celebrity, dancer and businesswoman.
- Ms.Acosta has over 5 million social media followers.
- Ms. Acosta has a licensed clothing line that is growing.
- https://www.cossamia.com/collections/body-by-rosa-acosta.
- Ms. Acosta has a performers contract for over $30,000

https://www.instagram.com/rosaacosta/?hl=en
http://www.rosaacosta.com/about/
http://www.rosaacosta.com
https://www.facebook.com/officialRosaAcosta/
https://www.marathi.tv/reality-tv-stars/rosa-acosta/
https://www.imdb.com/name/nm3637114/
https://hot963.com/2507785/who-is-rosa-acosta/
https://www.cossamia.com/collections/body-by-rosa-acosta
https://www.cossamia.com

**Ms. Acosta's e commerce site and products**

**COSSAMIA**      CossMia    Anti-Cellulite    Body by Rosa Acosta ⌄    Geebin Flores    Angel Brinks    More ⌄

HOME · SHOP COSSAMIA

### Shop CossMia

Sort by

Featured

Explore

Dresses
Activewear
Leggings
Skirts
Tops
Bottoms
Accessories
Sets
Shapewear
Swimwear



Samba Leggings
$29.75 $35.00



Lnca bodysuit
$35.00 $59.00



CossaMia Gift Card
From $25.00 - $500.00

\*All documents, reference material, exhibits and other material considered in
rendering or forming my opinions are available by request to Counsel.

| EARNING DOCUMENTS |
| --- |
| Comedy after dark contract. |
| Adwizar contract. Social media postings Guarantee $20,000 per month. |
| Various Performer agreements |
| OnlyFans |

**PERFORMER AGREEMENT**

As of October 14, 2011

Rosa Acosta
c/o Amina Diop
3080 Pharr Court
North #26
Atlanta, GA  30305

Dear Rosa:

This agreement (together with the attached Standard Terms and Conditions, this "Agreement"), will confirm the terms of the agreement between Rosa Acosta ("Performer") and Comedy After Dark, LLC ("Producer"), concerning Performer's services as a co-host of two (2) ninety (90) minute standup comedy specials currently entitled "Walter Latham's Comedy After Dark" (individually and collectively, "Program" hereunder).  The Program is currently intended for initial exhibition on Producer's YouTube channel.

Producer's obligations under this Agreement are conditioned upon satisfaction of the following conditons precedent: Performer's execution and delivery to Producer of this Agreement and Performer's submission of all employment and immigration forms required by Producer.

1.    SERVICES.

        A.     Producer hereby engages Performer to render services as a co-host of the Program.  Performer shall render all services required by Producer during the term of Performer's engagement hereunder, when and where consistent with this Agreement, and in the manner specified and required by Producer.  Producer's determination in all matters respecting the performance of Performer's services including, but not limited to, matters involving artistic taste and judgment, shall be final and controlling.  Performer shall be available to participate in any rehearsals, creative meetings, phone calls, pre-production, post-production and voice tracking work for the Program as directed by Producer.    Performer's employment hereunder includes performance in and/or appearance in non-commercial openings, closings, bridges, lead-ins, lead-outs, behind-the-scenes footage and on-air promos, etc. and no additional compensation is payable to Performer so long as such are used in or in connection with the Program(s).

        B.     Performer shall also attend, participate in and assist Producer with a reasonable number of marketing, public relations and press events for the Program as directed by Producer including, but not limited to, web-cast video commentary programs, press meetings, radio media tours, television appearances, print ads and enhanced or bonus content for online, mobile and other new media.

        C.     Without limiting anything contained herein, Performer shall also render the following social media promotional services for the Program: (i) upon commencement of pre-production of the Program, post no less than five (5) "tweets" and five (5) posts on Performer's Twitter and Facebook accounts about Performer being featured in the Program and also describing what the Program is about; (ii) post no less than five (5) "tweets" and five (5) posts on Performer's Twitter and Facebook accounts during principal production; (iii) post no less than five (5) "tweets" and five (5) posts on Performer's Twitter and Facebook accounts per week during the two (2) weeks prior to the premiere of the Program; (iv) post no less than three (3) "tweets" per day on

Performer's Twitter account during the premiere week including posting five (5) "tweets" the day of the premiere episode; (v) if requested by Producer, participate in a live video-chat with fans hosted on YouTube or the Program Facebook page during the premiere week; (vi) conduct a live blog during the premiere of the Program; (vii) participate in conference calls with online social media, television, radio and print outlets two (2) weeks prior to the Program's premiere; (viii) include a link to the Program's Facebook page and YouTube channel on Performer's Facebook pages and personal websites for the initial twelve (12) month run of the Program; (ix) post no less than two (2) "tweets" on Performer's Twitter account per day during the initial twelve (12) month run of the Program; and (x) in the event Performer establishes platforms (e.g., a television show) other than or in lieu of the outlets described above during the term of this Agreement, Performer shall inform Producer of such platforms and shall use such platforms to an extent equal to the outlets listed above.

Producer shall provide Performer the specific content and images (if any) for all of Performer's "tweets" or posts hereunder.

2.    SERVICE DATES.  Performer will make herself available for (a) four (4) consecutive days currently scheduled for February 8, 9, 10 and 11, 2012 inclusive of preproduction, rehearsal, principal photography, behind-the-scenes footage, interviews and publicity photos for bonus and publicity materials and (b) two (2) nonconsecutive days for looping, other post production services, and publicity and promotion.  The Program shall be filmed over two (2) nights during such time period.

3.    LOCATION OF SERVICES.  Miami, Florida.

4.    COMPENSATION.  Provided Producer is not in material breach or default hereunder and Performer has rendered all services required by Producer hereunder, Producer shall pay to Performer the following:

        A.     Fixed Compensation.  The one time, all-in sum of Thirty Thousand Dollars ($30,000) as full and complete consideration for all of the rights Performer grants to Producer as set forth in this Agreement.  The Fee shall be payable as follows:  ten percent (10%) upon execution of this Agreement by Performer and Producer; forty percent (40%) upon commencement of Performer's services as required by Producer; thirty percent (30%) upon completion of principal photography of the Program; ten percent (10%) upon the premiere of Producer's YouTube channel, but in any event no later than April 6, 2012and ten percent (10%) upon completion of Performer's services set forth in Paragraph 1.C.(i)-(vii).  The Fee shall be credited against Performer's share of Producer's Defined Receipts (as defined below), if any, payable to Performer.  The Fee payable hereunder shall be allocated between Performer's co-hosting services and social media promotional services as follows:  (a) the sum of Five Thousand Dollars ($5,000) shall be allocated for Performer's co-hosting services and (b) the remainder of the Fee shall be allocated for Performer's social media promotional services as set forth in Paragraph 1.C.(i)-(vii) above.

        B.     Contingent Participation.  A sum equal to ten percent (10%) of one hundred percent (100%) of Producer's Defined Receipts ("PDR") of the Program, less

Rosa Acosta

Updated (A/G/S)
August 8, 2015

## SOCIAL MEDIA SERVICE CONTRACT

This Social Media Service Contract ("Contract") is made effective this _9th_ day of _November_, 2015, as a legally binding agreement by and between Adwizar, Inc. ("Adwizar"), with an address of 1055 West 7th Street, 33rd Floor, Los Angeles, California 90017, and We See Stars, Inc. ("Client"), with an address of _14622 Ventura Blvd 772 Sherman Oaks, CA 91403_, furnishing the services of Rosa Acosta.

## I. AGREEMENT

**WITNESSETH:**

**WHEREAS,** Adwizar is in the business of providing services in the area of social media relations and is capable of providing a myriad of services designed to boost social media presence including monetizing social media and driving customers into sales;

**WHEREAS,** Client desires for Adwizar to provide said services; and

**WHEREAS,** Adwizar and Client have reached an agreement as to all material terms and conditions of said services, and are desirous of reducing the terms and conditions of their agreement to writing.

## II. TERMS

**NOW THEREFORE, in consideration of the mutual promises and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:**

1. **Exclusivity.** Client grants Adwizar the exclusive right during the Term hereof to establish and/or optimize Client's presence across the agreed upon platforms and monetize Client's brand presence in accordance with the terms set out in this Contract.

By entering into this Contract, Client warrants and affirms that Client is not currently engaged in or obligated under any prior agreements, whether verbal or otherwise, that will affect the exclusivity aspect of this Contract.

2. **Duration.** Adwizar will render services to Client for an initial period of 365 days beginning on _Nov 10_, 2015 and ending on _Nov 10_, 2016 (the "Term", including any applicable renewal periods), unless terminated sooner in accordance with the terminating provisions set forth herein.

(a) Adwizar may have the first thirty (30) days to establish a presence on behalf of Client across all agreed upon platforms ("Launch Period"). During this Launch Period, Adwizar will work to establish what techniques will work best for Client. After the thirty (30) day Launch Period, Adwizar will become responsible for the maintenance portion of the Contract whereby Adwizar must achieve a weekly quota of social interactions on behalf of Client by posting content to Client's accounts similar to that developed in the Launch Period.

Rosa Acosta

and any additional payments due to Client thereafter, until the amount is recovered in full. Client must provide Adwizar with account access and authorization as described in Section 7 within 48-hours of Client's execution of this Contract. Failure to timely provide Adwizar with account access and authorization shall be deemed a material breach of this Contract.

(b) Adwizar shall release Client's advance within two (2) business days of Adwizar's receipt and approval of (i) Client's Contract and (ii) any additional administrative paperwork necessary for consummation of the foregoing agreement (i.e. tax forms, letters of direction, wire information). However, if Adwizar has yet to be provided with administrative access to Client's social media accounts (Sec. 7), Adwizar shall be under no obligation to release Client's advance until such time. Once Client provides Adwizar with administrative access to Client's social media accounts (Sec. 7), Adwizar shall release Client's advance within two (2) business days thereof. Adwizar may begin posting content to Client's social media accounts immediately following Adwizar's release of Client's advance.

(c) Client shall be responsible for immediate repayment of any unrecouped portion of the advance if, ninety (90) days prior to the conclusion of the Term, Client's advance has yet to be fully recouped by Adwizar. Notwithstanding the provisions of paragraph 2(c), Client's failure to timely repay the advance prior to the conclusion of the Term shall result in automatic monthly extensions of this Contract until (i) the advance is recouped in full or (ii) Client repays any unrecouped portion of the advance.

**6. Guarantee.** Given the overall influence and engagement presented by Client's social media accounts, Client qualifies for and Adwizar shall generate a minimum of $20,000 in total earnings per calendar month beginning in the first full calendar month following the Launch Period.

Total earnings shall be defined as the total gross monthly advertisement revenue generated by the agreed upon social media platforms prior to any distributions and/or payments.

Notwithstanding the early termination provisions discussed below (Sections 14 through 17, collectively, the "Termination Provisions"), Client shall have the right to terminate this Contract without penalty, subject to Client's repayment of any unrecouped portion of the advance, with 30-days written notice to Adwizar if during any calendar month Adwizar fails to meet the aforementioned guarantee, save and except for when such failure is due to one (1) or more of the following:

    (i)    Adwizar loses access to Client's social media account (Sec. 8);
    (ii)   Client elects to suspend operations under this Contract (Sec. 11);
    (iii)  Client's continued removal of content (Sec. 13);
    (iv)  Any service interruption or other cause for postponement (Sec. 18);
    (v)   The death, incarceration or grave illness or injury of Client (Sec. 19);
    (vi)  Any default or breach of Client's duties and/or obligations under this Contract; or
    (vii) In accordance with any other provision contained herein excusing Adwizar from meeting the monthly guarantee.

**7. Account Access & Authorization.** Adwizar is authorized by Client to assume the identity of Client in all social media interactions on the agreed upon social media platforms

Client    Adwizar

**Rosa Acosta**                                                       4:64 PM   

Rosa Acosta patreon and only fans earnings .

**To:** imageexpertwitness@gmail.com

| Month | Funds Transferred To You* | Funds Used For Pledges to Other Creators | Total Funds Deducted From Creator Balance |
|---|---|---|---|
| May 2019 | $4,942.25 | $0.00 | $4,942.25 |
| Apr 2019 | $2,552.61 | $0.00 | $2,552.61 |
| Mar 2019 | $8,451.24 | $0.00 | $8,451.24 |
| Feb 2019 | $3,026.93 | $0.00 | $3,026.93 |
| Jan 2019 | $7,938.87 | $0.00 | $7,938.87 |

*Note: The actual amount that you'll receive in your bank account will be slightly smaller than the amount you withdraw from your creator balance because payment processors charge fees for the transfer.

---

1:46  ◀ Search                              🔒 onlyfans.com

EARNING STATISTICS

YOUR EARNINGS   TOTAL (GROSS)   TOTAL (NET)
**All time**        $116,897.05    **$93,515.12**

**May, 2019**

SUBSCRIPTIONS   TIPS   MESSAGES   REFERRALS
$1,239.38      $30.00  $2,220.00   $0.00

TOTAL (GROSS)   TOTAL (NET)
$3,489.38      **$2,791.38**          ∧

| April, 2019 | **$9,969.54** ∨ |
|---|---|
| March, 2019 | **$12,937.41** ∨ |
| February, 2019 | **$13,856.85** ∨ |
| January, 2019 | **$15,608.99** ∨ |
| December, 2018 | **$10,758.20** ∨ |
| November, 2018 | **$10,082.59** ∨ |
| October, 2018 | **$14,910.47** ∨ |
| September, 2018 | **$2,599.68** ∨ |

---

6:22  ◀ Search                              🔒 onlyfans.com

← STATEMENTS                                          ⊘

**TOTAL**   GROSS **$716270.34**   NET **$572986.49**

| June, 2021 | $15977.88 ∨ |
|---|---|
| May, 2021 | $20799.16 ∨ |
| April, 2021 | $28739.91 ∨ |
| March, 2021 | $29787.66 ∨ |
| February, 2021 | $15775.82 ∨ |
| January, 2021 | $13798.43 ∨ |
| December, 2020 | $16411.64 ∨ |
| November, 2020 | $17071.10 ∨ |
| October, 2020 | $20012.75 ∨ |

Here's year 2015/16 for Cassa4ia

| Day ▲ | Orders | Gross sales | Discounts | Returns | Net sales | Shipping | Tax | Total sales |
|---|---|---|---|---|---|---|---|---|
| Summary | 2,338 | $206,520.97 | −$8,204.54 | −$10,696.74 | $187,619.69 | $8,151.15 | $9,743.82 | $205,514.66 |
| Jan 1 | 1 | $95.00 | $0.00 | $0.00 | $95.00 | $20.00 | $0.00 | $115.00 |
| Jan 2 | 13 | $739.20 | $0.00 | −$356.00 | $383.20 | $63.00 | $8.58 | $454.78 |
| Jan 3 | 9 | $521.70 | $0.00 | $0.00 | $521.70 | $86.00 | $21.45 | $629.15 |
| Jan 4 | 8 | $950.90 | −$8.90 | $0.00 | $942.00 | $21.00 | $77.17 | $1,040.17 |
| Jan 5 | 3 | $321.90 | $0.00 | $0.00 | $321.90 | $7.00 | $26.30 | $355.20 |
| Jan 6 | 6 | $454.89 | $0.00 | $0.00 | $454.89 | $66.00 | $4.42 | $525.31 |
| Jan 7 | 6 | $377.70 | −$35.30 | −$388.00 | −$45.60 | $28.00 | $8.85 | −$8.75 |
| Jan 8 | 20 | $1,083.70 | −$13.25 | $0.00 | $1,070.45 | $91.00 | $62.76 | $1,224.21 |
| Jan 9 | 12 | $1,451.79 | −$22.65 | $0.00 | $1,429.14 | $125.00 | $15.77 | $1,569.91 |
| Jan 10 | 5 | $692.90 | −$7.90 | $0.00 | $685.00 | $14.00 | $12.61 | $711.61 |

🔍 Search    RA Rosa Acosta

| Day ▲ | Orders | Gross sales | Discounts | Returns | Net sales | Shipping | Tax | Total sales |
|---|---|---|---|---|---|---|---|---|
| Summary | 2,435 | $222,888.46 | −$4,310.07 | −$13,786.99 | $204,791.40 | $20,424.00 | $3,450.11 | $228,665.51 |
| Jan 1 | 12 | $675.00 | $0.00 | $0.00 | $675.00 | $100.00 | $0.00 | $775.00 |
| Jan 2 | 15 | $1,135.00 | $0.00 | $0.00 | $1,135.00 | $106.00 | $0.00 | $1,241.00 |
| Jan 3 | 16 | $1,227.00 | −$15.50 | $0.00 | $1,211.50 | $175.00 | $0.00 | $1,386.50 |
| Jan 4 | 14 | $1,664.00 | $0.00 | −$45.00 | $1,619.00 | $145.00 | $5.40 | $1,769.40 |
| Jan 5 | 5 | $395.00 | −$35.00 | −$224.00 | $136.00 | $85.00 | $0.00 | $221.00 |
| Jan 6 | 9 | $550.00 | −$7.50 | $0.00 | $542.50 | $90.00 | $0.00 | $632.50 |
| Jan 7 | 11 | $447.00 | −$4.50 | $0.00 | $442.50 | $80.00 | $0.00 | $522.50 |
| Jan 8 | 15 | $1,724.00 | −$84.20 | $0.00 | $1,639.80 | $160.00 | $0.00 | $1,799.80 |
| Jan 9 | 14 | $917.00 | −$18.50 | $0.00 | $898.50 | $158.00 | $0.00 | $1,056.50 |
| Jan 10 | 5 | $630.00 | $0.00 | −$55.00 | $575.00 | $85.00 | $0.00 | $660.00 |
| Jan 11 | 3 | $575.00 | −$44.50 | $0.00 | $530.50 | $30.00 | $0.00 | $560.50 |
| Jan 12 | 9 | $1,137.00 | −$47.60 | $0.00 | $1,089.40 | $33.00 | $0.01 | $1,122.80 |

See More from steve chamberlin

--
Rosa Acosta
www.rosaacosta.com
www.twitter.com/rosaacosta

Rosa Acosta

**Use by Defendants**





**Advertising.**
"Faraones Night Club" attached
to Rosa Acosta's image

**Rosa Acosta**

**Social Media Use**



**Advertising.**
"Faraones Night Club" attached
to Rosa Acosta's image

Original Image of Rosa Acosta
Editorial Photo of Ms. Acosta





**Rosa Acosta**

- Ms. Acosta is more than a model. She is a dancer, performer, celebrity, designer, social media influencer and Businesswoman.

- Ms. Acosta has commercialized the use of her image differently than paid by assignment.

- Ms. Acosta was paid $30,000 by Comedy after Dark for 2x 90 min Appearances + postings on social media.

- Ms. Acosta was guaranteed $20,000 a month for 1 year to allow Adwizar to post on her Social Media. Ms. Acosta's Patreon subscriptions are averaging approx $5,000 per month after expenses for 1 day shoot a yearly quarter.

- Ms. Acosta's fan only pages are grossing on average over $35,000 per month for an average of 3 day shoots a month.

- Ms. Acosta's E commerce site CossaMia.com that is owned by Ms. Acosta and she is the face of CossaMia has Net sales in 2015 of over $187,000 and 2016 of over $204,000.

- Ms. Acosta promotes her own personal Brand and the products she sells. Defendant's Night Club used an image of Ms.Acosta that was on their timeline and promoted Ms. Acosta as a Patron of the Night Club or an employee of the Night Club. Defendants used Ms. Acosta's image to promote a singles night, $2 drinks, Bottles and free admission and Hookah. Association Ms. Acosta's brand does not need to be associated with or benefit from.

- Ms. Acosta does not have a straight line comparison charged for Advertising a Night Club. Taking into account personal promotion days such as Ms. Acosta's Comedy appearances (2 appearances for $30,000) and the value of Ms. Acosta as the face of her Brand and similar rates as have been quoted for Celebrities of Ms. Acosta's standing a Fair Market Value of a $10,000 for a quoted Day Rate is conservative.

- It is important to note that a quoted Day Rate is for the model's time on set. (The accepted way that an advertiser obtains photos of a model for use in their advertisements. It is also easily understood that above and beyond that rate that 'usage' rates would be quoted depending upon the way in which the advertiser uses the images obtained form the photo shoot. For example, posters, billboards, flyers, world wide distribution on Social Media, personal references to the product All usages are negotiated and attract negotiated payments.

- Based on my experience and expertise in this industry, when negotiating a rate of compensation for Rosa Acosta for the identified image used by Defendants, at a minimum, I would quote a day rate of $10,000.

**Rosa Acosta**

**Calculation of Fair Market Value for Images Used cont.**

**Image 1**

Ms. Acosta's image was used by Defendant's Club  to advertise their company and their services. Defendant's Club used Ms. Acosta's image and distributed the image on Social Media. Defendant implied she worked at the club, endorsed the use of her image, would be in attendance at the club and promoted the sale of alcohol and other services

**Usages**:

- **Advertising: "Faraones Night Club**" attached to Ms. Acosta's image.  ($10,000)

- **Social Media:** Ms. Acosta's image was used and distributed world wide on Faraones Night Club's Social Media pages ($10,000)

**Rosa Acosta's actual fair market value for use of her images by Defendants is $20,000**

REFERENCE MATERIAL

Information considered relating to the Defendants, history, profile, and focus on promoted events, including but not limited to social media promotional material is also required to gain an understanding of the specific product or consumer experience that the Defendants advertise.

Defendant's club is a night club with the product being advertised by Defendants and across their Social Media pages, web pages and associated articles is events and parties to sell alcohol and food. The association of the Defendant's clubs would not help a model's career, be an assignment that would produce work that would assist in further bookings nor would it be an association other products would want their model's or spokeswoman to have.

Images attached below detail the type of publicity, image, style and further advertising Defendants' have used. This information is important in the determination of Fair Market Value for the use of Plaintiff's images. The type of exposure and association would have been determined in negotiations as a job priced in the high region of a Model's past commercialization of their image and day rate.

https://faraones-night-club.business.site
https://www.facebook.com/FaraonesNightClubNJ/
https://www.restaurantji.com/nj/plainfield/faraones-night-club-/
https://www.instagram.com/faraonesnj/?hl=en
https://www.loc8nearme.com/new-jersey/plainfield/faraones-night-club/3741276/
https://restaurantguru.com/Faraones-Night-Club-Plainfield
https://www.mangoplate.com/en/restaurants/ge1wEjgphGVS



Examples of Defendants' advertising.



## Faraones Night Club

| | 4.5 | 0 | 0 |

| | |
|---|---|
| Address | 111 E Front St Plainfield, NJ 07060 |
| Phone Number | 1-908-456-1306 |
| Cuisine | Latin American |
| Price Range | Less than 10,000 Won |
| Website | Go to the restaurant's homepage |







Examples of Defendants' advertising.



Examples of Defendants' advertising.























Examples of Defendants' advertising.
























**Examples of Defendants' advertising.**







**Examples of Model's Work Product and Images.**

ROSA ACOSTA





CossaMia















**Annexes**

Annex 1

## Association of Model Agents – The White Book,



**Internet and e-commerce rates**

| Client websites | | | |
|---|---|---|---|
| Home page | No click through | | Advertising day rate |
| Home page | With click through | To e-commerce | Advertising day rate X 150% |
| Section page | No click through | | Advertising day rate |
| Section page | With click through | To e-commerce | Advertising day rate X 100% |
| Thumb nails | With click through | To e-commerce | Catalogue day rate |
| 3rd party usage | ie on another client website | To e-commerce | Advertising day rate X 100% |
| Pop-up ad | Establish if it is a national or | Establish if | Advertising day rate as above, |
| Banner ad | international brand | e-commerce link | dependent on e-commerce |

*Note: A home page or a section page is also called a 'landing page'*

| | Extra internet usage | | |
|---|---|---|---|
| | **Channel** | **% of 'day rate'** | **Advertorial websites** |
| Web channels 'extra usage' | Face Book | 100% | *Establish the nature of the website – e.g.* |
| | All other social networks | 50% | *media, advertorial, editorial and above all, is it linked directly or indirectly to* |
| | Twitter | 50% | *e-commerce* |
| | 4 square | 50% | |
| | Apps | 50% | *Look for an advertorial day rate, at least* |
| | Blogs | 50% | |
| | e-mail | 50% | |

## Association of Model Agents – The White Book,



**Internet and e-commerce rates**

### Introduction

A lot of debate surrounds New Media and, at the present time, there are no clear guidelines – neither for clients nor bookers. The AMA cannot set rates but, below are some principle which bookers can consider in rate negotiations. For the most part everything is linked to the day rate or the advertorial rate that a particular model can command. Thereafter, rates are based on multiples of that rate.

Client will often plead ignorance as to the real usage of a model's 'internet' presence. Bookers should not accept this. Consider that Facebook and Twitter are now part of 65% of companies marketing strategies. Clients do take it seriously and must be prepared to pay for the media.

**Annex 1** *cont.*

## Association of Model Agents – The White Book,



The standard rates listed in the AMA editorial rate chart cover the right to publish once in a specified title.  Any of the following would incur additional fees: -

- Use in other titles published by the same house
- Syndication to foreign editions
- Point of sale usage (see also Additional Usages)
- TV spots to advertise the issue
- Poster ads
- Press ads
- Internet usage

For bookings featuring special/international models bear in mind the following possibilities:-

- Confirmation form could specify layout (re what has been agreed to be published along with a guarantee of publication)
- A release form in which the photographer has to sign over copyright to the model
- Copy/picture/layout approval
- No unauthorised usage of text/pictures (ie syndication, advertising or PR )
- Interview subject matter in writing prior to the event
- Crew approval

0014.R01.6990.071819

Annex 2.

## Proper Engagement of Modeling Talent – Negotiation



Models do not sell their image rights for advertising.



The basis of all negotiations is a day rate compensation for work by the model.



All usages are negotiated prior to the shoot taking place.



Once an image is on the Internet and associated with an advertiser, the number of views, "shares," downloads, and copies made is unknowable.



The proper way to obtain images for advertising is to negotiate a contract first between the model or agent and arrange a photo shoot.



The day rate is based on the model's desirability and numerous factors such as demand for her services and relevance to product.



Additional usages or extension of time periods of use are negotiated before coming in to effect.

0017.07.R01.6900.071919

# THE WHITE BOOK
## A GUIDE TO MODEL FEES

Sub

AMA

*Published by the Association of Model Agents for the use of Members only*

---

### EDITORIAL

The standard rates listed in the AMA editorial rate chart cover **the right to publish once in a specified title.** Any of the following would incur additional fees:-

• Use in other titles published by the same house
• Syndication to foreign editions
• Point of sale usage (see also Additional Usages)
• TV spots to advertise the issue
• Poster ads
• Press ads
• Internet usage

For bookings featuring special/international models bear in mind the following possibilities:-

• Confirmation form could specify layout (ie what has been agreed to be published along with a guarantee of publication)
• A release form in which the photographer has to sign over copyright to the model
• Copy/picture/layout approval
• No unauthorised usage of text/pictures (ie syndication, advertising or PR )
• Interview subject matter in writing prior to the event
• Crew approval

### PRESS ADVERTISING

*The minimum rate for advertising in magazines and newspapers is £2,000 per day for one year in the UK*

ADDITIONAL TERRITORIES

The fee for additional territories is a percentage of the day rate per territory based on the economic strength of the country concerned

BUYOUT PERCENTAGES

W.Europe 700%  •  E.Europe 400%  •  Pan European 1,000%
USA 600%  •  Americas 1,000%  •  Asia 600%
Rest of the World 1,000%  •  Worldwide 3,000%

### PR/ADVERTORIAL

PR refers to pictures which will be submitted by a client (often in the form of a press kit) for free insertion in, for example, magazines or newspapers

Usage can be restricted: eg pictures to be used only in relation to the specified product, no cover use, no syndication etc.

*The minimum PR rate for one use in the UK is £1,200-£1,500 per day*

NB   The client's definition of PR may differ from that given above. The PR rate is not intended to cover advertising or editorial use. Neither should PR be confused with 'advertorial' for which the client buys advertising space and which is an editorial/advertising collaboration. Fees for advertorial should be negotiated accordingly.

### ADDITIONAL USAGES

Other than packaging and posters (see below) additional usage may take the form of any of the following:-

• Point of sale
• Showcards
• Leaflets
• Brochures/catalogues/look books
• Posters (in-store, not shop windows - see under 'POSTERS' below)
• Swing tickets
• Videos
• Window display material
• Life-sized cut-outs

The fee for the above is an additional day rate per use

Please note that the client's definition of 'point of sale' may vary from the original AMA definition, ie material used quite literally at the point of sale - the cash register.  When your client uses the form he may be referring to all or any of the above uses. The extra day fee is charged for **each and every** additional usage.

### PACKAGING

The rate for packaging is an additional fee of up to twice the day rate depending on the length of usage required.

When negotiating consider whether or not the model is recognisable, and also the time limit, quantity and territory. Carrier bags, gift boxes, video boxes and CD covers may also be considered as packaging.

2

3

## POSTERS

There are several types of posters: always find out which is required and negotiate accordingly:-

* 48 sheet: an additional fee of up to twice the day rate. Ask about the number of sites required - a large number may suggest a higher fee.
* Ad-shell, underground, public display posters (ie bus sides, airports, train stations etc): an additional fee of 1.5 times the day rate.
* Posters in shop windows: additional day rate.

### BOOK COVERS

The *minimum* rate is £500 per day. This should be restricted to one print run of the book. Any reprints or additional territories will incur an additional fee. When negotiating a book cover fee, ask if the model will feature in any additional or promotional material and if so negotiate an appropriate fee.

### INTERNET

* Selling off the page
    Catalogue: plus one day rate
    Advertising: plus 50% of day rate per targeted country
* Featured artists (not selling, but model featured significantly)
    Plus 50% of day rate (all uses)
* Incidental usage (including corporate/reference use)
    Plus 25% of day rate (all uses)
* Internet usage only
    One day rate
* TV commercials on internet
    UK: 400% of BSF for one year (Equity guidelines)
    Part-Europe buyout for one year: Big country 200% BSF, small 100%BSF
    All TV rights can be offered for a small discount

NB: Check duration - images get left, keep internet fee separate where possible
*BEWARE*: Other digital users (eg mobiles); Internet channels (eg Vogue.com/ Fashion TV); Multi-national usage (eg Gap).

### CATALOGUES

Catalogue fees vary a great deal and it is not possible to cite an 'appropriate' fee, £800 per day is suggested as an absolute minimum.

Off-page selling: where catalogue pictures are used for off-page selling, ie advertising the catalogue in magazines and newspapers, the suggested additional fee, per image, is from £500 up to the day rate.

4

Following discussion with senior bookers The AMA has prepared a schedule of the model and usage fees which are currently deemed appropriate.

Please remember, this is not a price list: fees available will depend on current market conditions and the client's requirements. For example additional uses attract an additional fee for each use but if several uses are required you may want to negotiate a 'deal'.

When negotiating bear in mind how the model's association with the product and the exposure of the campaign will affect her career both present and future; make sure the final fee reflects this. If the job is likely to lessen her chances (however slightly) of being associated with prestigious clients or of obtaining more lucrative deals, this may imply a higher fee. However if it will have a more positive effect you can afford to be more flexible.

If your model is a high flyer and likely to be considered for contracts, bear in mind that luxury brands tend to favour models who have not been associated with food or more 'ordinary' products eg cars, household goods, middle market fashion and cosmetics.

We refer below to the model's 'day rate'. A 'day' in this case refers to an 8-hour period between 9am and 6pm (usually 9am-5pm or 10am-6pm). An extra hour between 9am and 6pm is charged at the normal rate - the appropriate overtime rate is charged only before 9am and after 6pm.

A client booking by the day gets 8 hours including an hour for lunch; the hourly rate may be calculated by dividing the daily rate by 7.

Fees quoted do not include any agency supplement.

All bookings are subject to AMA Terms and Conditions.

1

## Internet and e-commerce rates

### Introduction

A lot of debate surrounds New Media and, at the present time, there are no clear guidelines - neither for clients, nor bookers.  The AMA cannot set rates but, below, are some principles which bookers can consider in rate negotiations.  For the most part, everything is linked to the day rate, or the advertorial rate, that a particular model can command.  Thereafter, rates are based on multiples of that rate.

Clients will often plead ignorance as to the real usage of a model's 'internet' presence.  Bookers should not accept this.  Consider that Facebook and Twitter are now part of 65% of companies' marketing strategies.  Clients do take it seriously and must be prepared to pay for the media.

| Client websites | | | |
|---|---|---|---|
| Home page | No click through | | Advertising day rate + |
| Home page | With click through | To e-commerce | Advertising day rate X 150% |
| Section page | No click through | | Advertising day rate |
| Section page | With click through | To e-commerce | Advertising day rate X 100% |
| Thumb nails | With click through | To e-commerce | Catalogue day rate |
| 3rd party usage | ie on another client website | To e-commerce | Advertising day rate X 100% |
| Pop-up ad | Establish if it is a national or | Establish if | Advertising day rate as above, |
| Banner ad | international brand | e-commerce link | dependent on e-commerce |

*Note: A home page or a section page is also called a 'landing page'*

| Extra internet usage | | | |
|---|---|---|---|
| Web channels Treat as 'extra usage' | Channel | % of 'day rate' | *Advertorial websites* |
| | Face Book | 100% | *Establish the nature of the website – e.g. media, advertorial, editorial and, above all, is it linked directly or indirectly to* |
| | All other social networks | 50% | |
| | Twitter | 50% | *e-commerce* |
| | 4 square | 50% | |
| | Apps | 50% | *Look for an advertorial day rate, at leas* |
| | Blogs | 50% | |
| | e-mail | 50% | |

| Shows | |
|---|---|
| Usage | Rate |
| On designer website and NO e-commerce | Show rate |
| Broadcast | Show rate + 50% |
| Direct to e-commerce | Catalogue rate |
| Indirect to e-commerce | 100% of show rate |

| Virals | |
|---|---|
| *Look for minimum advertising day rate.  Use TV usage as a guide* | |
| Usage | Rate |
| National brand | Advertising day rate |
| International brand | Advertising day rate X 2 + |
| *Check the client's strategy* | |
| TV commercial as viral – national brand | Day rate + 50% |
| TV commercial as viral – international brand | Day rate X 2 or more |

Industry Standards Reference websites.

https://www.thebalancecareers.com/what-is-a-buyout-rate-in-modeling-2379446

 careers › Buyout Rate and Modeling

# Buyout Rate and Modeling

Pros and Cons of the Advance Payment

  



▶ Modeling Careers

**HOW TO BECOME A
MODEL**

BY VANESSA HELMER | Updated November 11, 2019

At some point in your modeling career, you may be offered what's known as a "buyout." But what does it mean? What does it cover? And is it a good idea? It's an important term to become familiar with, so let's explore the details.



### What Is a Buyout?

In the modeling industry, a buyout is basically an advance payment for future use of a particular photo or set of photos. Instead of paying the model residuals (repeat payments each time the photo is used), the client and the agency negotiate a one-time fee that allows the client to use the photo(s) as many times as they'd like.

### For Freelance Models or Agency Models?

Buyouts are offered to both independent models and those under agency representation. Models with agencies often come out on top, though, because agencies are familiar with these types of contracts and know how to negotiate top buyout rates and the fairest terms.

### Why Use a Photo Repeatedly?

Companies don't want to use the same old advertisements year after year, and readers don't want to see them either. So why bother with buyouts, you ask?

Well, buyouts can cover multiple types of media. Rather than using one shot for one type of ad, the client can negotiate the buyout to cover all sorts of media types, such as in-store marketing, digital ads, billboards, flyers, newsletters, brochures, bus ads...the list goes on and on.

### Will It Appear Somewhere I Don't Want It To?

No. The terms of the buyout contract should state that your photos will only be used by the original company to promote their services or products. They can't be sold to a third party or manipulated to change their intended purpose.

### How Much Are Buyout Fees?

Buyouts are usually paid in addition to the day rate, but sometimes they're included. In general, the buyout rate works out to be about half of the original daily rate. So depending on the type of job, the client, and whether you're freelance or under agency representation, you could get paid anywhere from a few hundred to several thousand dollars.

 **Important:** Agency-represented models will usually get a better deal than freelancers when negotiating a buyout.

### What Do They Cover?

The terms of a buyout vary. The buyout contract might be limited to a certain geographical region (only effective in the state of New York, for example) or to a certain time period (it's common for contracts to only last one or two years). However, it's possible for the terms to cover an unlimited-time, worldwide buyout. That means the client can use the photo in any country for as long as they want.

<u>https://www.modlapp.com/usage</u>

## Pricing and agreeing on usage

Models and booking clients must agree on the usage terms for images and the fee associated with it. Traditionally, usage is calculated using the basic shoot fee (BSF); the total fee paid to the model for their time during the creation of the material. The BSF is multiplied upwards based on the usage requirements of the marketing material. Each type of media, territory, and timespan commands an industry-typical multiplier effect.

There are no laws on how much or little you can or should pay for usage, everything is based on industry standards and you simply have to agree on this with the model. However, models are well aware of these industry standards and experienced models understand the value of their image. This makes them reluctant to sign away control of their image without sufficient remuneration. Ultimately, you need a model to sign a document agreeing to the intended usage and you need to adhere to those terms. **The more you offer for this usage, the better the quality of model you will attract to your job.**

<u>https://aphotoeditor.com/2010/02/05/ad-agency-guide-to-photography-usage-terms/</u>

Generally, think of usage costs reflecting the amount of exposure a particular image may receive. The more exposure, the higher the price. Exact terminology may differ, but the semantics remain the same if all of the information is included in each negotiation. You can phrase it any way you want, but be clear about the INTENT by including information from all categories outline below. Talent usage is similar, but there are differences in how each medium is priced out: talent usage tends to be much more specific. Again, it is based on exposure. European terminology will differ from US terminology, particularly in the "Print" category. In Europe, "Print" includes anything that is not broadcast.

https://www.svenlerphotography.com/photography-blog/model-rates-how-much-do-agencies-charge

**Usage Fees** Professional photographers charge usage and license fees for their images and so do agencies. These fees very largely depending on a whole lot of factors, such as the agency, the market, the model, and of course where and how the image will be used. Naturally, the usage fee for a pamphlet for medium-sized company will be significantly lower than the usage fee for an international ad campaign. If you plan to use the pictures for an ad campaign, most agencies will also expect you to inform them about the nature of the product and/or the brand. There is usually no usage fee if you just want to use the pictures for your Portfolio.

**Other Terms and Conditions** Alright, once you negotiated all of the above, there are still some things that you should negotiate with the agency beforehand. Remember, modeling and photography is a business and you should treat it as such. This especially hold true when it comes to binding contracts. Depending on the agency, many of the following terms will not be negotiable.

https://aphotoeditor.com/2010/02/05/ad-agency-guide-to-photography-usage-terms/

**TIME PERIOD or LENGTH OF TIME**

This is the length of time an image or images will be used: one year, two year, one time, etc.. It is best to specify "from date of first use" when negotiating a contract for an image. Standard use generally defaults to one year use {from shoot date} in a specific medium unless terms are otherwise negotiated.

**RIGHTS/QUANTITY**

This is the number of times within the time period that the image will be used.

**Limited:** A limited number of times such as "2 insertions" or "run of 5,000" within the time period purchased. By the time you reach multiple insertions in publications such as People or USA Today, you may as well buy unlimited rights.

**Unlimited:** Can be used an unlimited (unspecified) number of times within the time period purchased. This does not allow a transfer of copyright to you or to your client, nor does it mean the same as "unlimited time." You both have only the rights to use the image, not to resell it or allow a third party to use it.

**Total Buyout:** You have purchased the copyright to the image and have full rights to do whatever you want with the image. You own it, basically. In the case of illustration, you own the rights, but you do not necessarily own the final art. That usually requires a very specific, carefully worded purchase agreement. Expect to pay dearly for this usage!

https://www.thefashionspot.com/runway-news/17519-modeling-terms/



**USAGE FEE/RATE:** Models get paid for two things: work they do on the set, and the right to use their images in advertising. Sometimes the fee will be "flat," meaning it includes both. But often the two will be separately listed in the booking, and the model will get paid for a specific, limited use of their pictures. If the client wants to do something more than what they paid for (different kind of publication media, different target audience, longer time, different geographical region) the model will get more money for additional usage.

The Professional's Guide to Modeling

Copyright 2008 The New Models Academy, www.newmodelsacademy.com
You can purchase the book here

<u>http://www.themodels.com.au/pages/terms-and-conditions</u>
<u>https://www.smgmodels.com/page/478/</u>

RATES

Quotes provided by the Agency will include shoot time only with usage quoted separately. A Booking Fee will also apply and be quoted.

USAGE

Additional fees are payable for the right to use the talent / model's image or reproductions / adaptations of, or drawings derived from that image, or any other representation of it, either complete or in part whether alone or in conjunction with any wording or other images, photographs, drawings or anticipated purposes which are in addition to and outside the scope of the initial permitted use, details of which are set out in the booking confirmation form, e.g. advertising, packs, posters, showcards, billboards, record covers, swing tickets etc. For the avoidance of doubt, additional fees are payable for the right to use the talent / model's image online or in any digital media including but not limited to Twitter, Facebook, Tumblr, Instagram, MySpace, YouTube, Flickr, Blogs or other social networking websites or media.

Unless otherwise agreed, the additional fees cover the right to use one image for one year from the date of booking, in Australia only, for the permitted use or uses or purposes agreed between the Agency and the client. Under no circumstances will each additional usage fee be less than the model's advertised day rate as determined by the Agency unless determined otherwise by the Agency in its absolute discretion.

Additional fees are also payable, and subject always to the Agency's prior consent, for the right to use the talent / model's image or reproductions etc, as set out above for all known or anticipated territories other than Australia.

It is the client's responsibility to outline full usage requirements at the time of booking. It is also the client's responsibility to ensure any creatives and brands associated with the booking are aware of these terms & conditions. Any and all additional usage must be negotiated with the Agency. The Agency reserves the right to refuse the release of images for any use for any reason including rollovers of existing print and television campaigns. Any image used without written authorisation or prior approval from the Agency will be deemed unauthorised usage and will be subject to penalty.

**8. ADDITIONAL FEES**

<u>TO BE AGREED AT THE TIME OF THE BOOKING OR BEFORE ANY ADDITIONAL USAGE IN ACCORDANCE WITH SECTION 3.1</u>

**1. USAGE**

Additional fees are payable for the right to use the model's image or reproductions, or adaptations of, or drawings derived from that image, or any other representation of it, either complete or in part whether alone or in conjunction with any wording or other images, photographs, drawings or anticipated purposes which are in addition to and outside the scope of the initial permitted use, details of which are set out in the booking confirmation form, e.g. packs, posters, showcards, record covers, swing tickets etc. For the avoidance of doubt, additional fees are payable for the right to use the model's image or reproductions, or adaptations of, or drawings derived from that image, or any other representation of it, either complete or in part whether alone or in conjunction with any wording or other images, photographs, drawings online or in any digital media including but not limited to Twitter, Facebook, MySpace, YouTube, Flickr, Blogs or other social networking websites or media. Unless otherwise agreed, the additional fees cover the right to use one image for one year from the date of booking, in the United Kingdom only, for the permitted use or uses or purposes agreed between IMG and the client. Under no circumstances will each additional usage fee be less than the model's advertised day rate as determined by IMG unless determined otherwise by IMG in its absolute discretion.

**2. TERRITORY**

Additional fees are also payable, and subject always to IMG's prior consent, for the right to use the model's image or reproductions etc, as set out in section 3.1 above for all known or anticipated territories other than the United Kingdom. Unless otherwise agreed the additional fees cover the right to use one image for one year or one season (as determined by IMG at the date of booking and as detailed on the booking confirmation form) from the date of booking, in the territory or territories agreed and stipulated on the booking form. Under no circumstances will each usage fee be less than the model's advertised day rate as determined by IMG unless determined otherwise by IMG in its absolute discretion.

<u>https://www.imgmodels.com/special-pages/terms-conditions</u>

"Under no circumstances will each additional usage fee be less than the model's advertised day rate as determined by IMG unless determined otherwise by IMG in its absolute discretion."

## https://www.modelmanagement.com/modeling-advice/model-glossary/

U

Usage – Models get paid for each different medium in which their photograph is used. These different mediums, or usages, may include: consumer magazines, trade magazines, product packaging, print ads, bus ads, subway ads, billboards, magazine covers, direct mail, magazine editorials, posters, catalogues, brochures, point-of-purchase (point-of-sale or p-o-p), annual reports, book covers, kiosk, duratrans (those big portable billboards that are towed around behind trucks), newspapers, etc. The model receives an additional fee for each usage the client buys. Usages also vary according to time and region. The longer the ad runs and the more markets in which it appe all drive up the model's fee. The largest usage is the unlimited time usage, worldwide buyout. That means the client can plaster the photograph across every city in the world in every possible usage until the end of time.



https://www.premiermodelmanagement.com/terms/

## 4. Usage.

An additional rate is payable for any use of photographs, or reproductions or adaptations thereof, or drawings therefrom, either complete or in part, alone or in conjunction with any wording or drawings. The "Usage" must be explicitly granted (as agreed on our confirmation of booking form and also specified on the relevant invoice – N.B. one image only may be used, unless otherwise agreed in writing) and defines the TYPE of usage, together with the TERRITORIES in which such usage is permitted and the DURATION of such usage. Under no circumstances will the basic usage fee be less than the Talent's advertising day rate. All fees must be paid PRIOR to any use of photographs for any purpose whatsoever. Usage fees remain payable, even in the event that the Usage purchased is not actually exercised.

## 5. Additional Usage.

An additional rate is payable for any additional (e.g. additional TYPES of usage, additional TERRITORIES or extended DURATION) Usage of the photographs, or reproductions or adaptations thereof, or drawings therefrom, either complete or in part, alone or in conjunction with any wording or drawings, other than Usage already agreed ("Additional Usage Rate"). The CLIENT is responsible for notifying Premier of any additional Usage requirement and negotiating (only with Premier) the Additional Usage Rate payable in respect of such additional Usage, PRIOR to any such additional Usage taking place.

Reference Material

- Celebrities' endorsement earnings on social media - Daily chart
- Intangible Asset & Intellectual Property Valuation/ A Multidisciplinary Perspective
- One Page Case Studies from Relatable - Global.pdf
- Right of Publicity — The Fashion Law
- The White Book Guide to Model Fees.

Earning Documents Considered  (Complete Files available by request to Attorney. )

Rosa Acosta

- [Statement] 2015-2016 Cossa Mia 1.jpg
- [Statement] 2015-2016 Cossa Mia 2.jpg
- [Statement] 2018-2019 OnlyFans Acosta.jpg
- [Statement] 2019 Patreon Acosta.jpg
- Acosta, Rosa - Co-Host Agreement CLEAN 01 12 12.pdf
- Acosta, Rosa - Co-Host Agreement REDLINE 01 12 12.pdf
- Rosa Acosta Contract Adwizar.pdf